196 N.J. Super. 273 (1984)
482 A.2d 192
MARCELA CORREA, PLAINTIFF-RESPONDENT,
v.
CARMELO MAGGIORE AND CATHERINE MAGGIORE, HIS WIFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1984.
Decided October 4, 1984.
*277 Before Judges MICHELS, PETRELLA and BAIME.
Steven E. Pollan argued the cause for the appellant (Dominick Giordano, attorney, of counsel; Steven E. Pollan on the brief).
Alan G. Tresser argued the cause for respondent (Goldman, Carlet, Garrison & Bertoni, attorneys; Alan G. Tresser on the brief).
PER CURIAM.
Plaintiff instituted this action to recover damages allegedly sustained by virtue of defendant's deliberate concealment of material facts pertaining to latent defects in certain residential premises. The principle thrust of plaintiff's claim was that defendant sold her a house without providing information regarding significant structural problems which substantially impaired its value. The jury awarded $33,000 in compensatory damages. Although plaintiff also sought punitive damages, none were awarded. On appeal, defendant contends that the jury's verdict was against the weight of the evidence and constitutes a gross miscarriage of justice. Defendant also argues that the quantum of damages assessed by the jury was so disproportionate to plaintiff's actual monetary loss as to shock the conscience and compel a new trial. In that vein, defendant asserts that plaintiff's expert witness was not properly *278 qualified with respect to the question of damages and that his testimony at trial constituted a mere "net opinion."
The genesis of this appeal was a real estate transaction wherein plaintiff purchased a two-family house in the City of Passaic from defendant for $25,000. At trial, it was undisputed that the house "leaned" or "tilted" to one side by virtue of its age and because of problems pertaining to deterioration of its foundation. Also uncontroverted was the fact that defendant was fully aware of this condition. At trial, defendant candidly acknowledged receiving two notices from the municipal building department directing him to submit architectural plans to correct the "sagging" of the house. At issue, however, was whether plaintiff was apprised of this condition and, if not, whether it was readily observable in any event. Conflicting evidence was presented with respect to that point. Plaintiff testified that she viewed the house on two occasions prior to signing the contract and did not notice the "leaning" condition. Between execution of the contract and the closing, plaintiff returned to the house several times but was unable to see any problem. Plaintiff further testified that she and defendant conversed on numerous occasions prior to the closing, but that he never informed her of any problem pertaining to the house. In point of fact, defendant repeatedly emphasized that plaintiff was "getting a good buy." Although conceding that he never specifically apprised plaintiff of the notices he had received from the municipal building inspector, defendant maintained that plaintiff was well aware of the fact that the house tilted to one side. Specifically, defendant testified that he discussed the problem with plaintiff on several occasions prior to the closing and that he referred her to a contractor for an estimate. The attorney plaintiff retained for the closing testified that she specifically mentioned the fact that the house was not straight during their conversation pertaining to the purchase price. Finally, the testimony of the real estate broker who first contacted plaintiff with respect to the house substantially corroborated that of the defendant. According to his testimony, *279 he accompanied plaintiff when she initially viewed the house. The "sagging condition" was not only readily apparent, but also was specifically discussed.
At trial, plaintiff presented several witnesses in an attempt to prove damages. Suffice it to say, overwhelming evidence was presented establishing both the severity of the structural problems relating to the house and the substantial nature of the measures necessary to correct them. The testimony of a licensed architect presented by plaintiff is highly illustrative. He testified that the foundation was rapidly deteriorating, that there was substantial "water seepage" and that many of the footings were apparently destroyed. According to his testimony, it was necessary to "lift" the house by "jacking" devices in order to correct these problems. Once the house was raised, concrete footings were to be poured along several points of the side walls. Steel reinforcements and lolly columns were to be installed. Raising the house would damage the plaster requiring cosmetic work. The architect testified that there was a "strong possibility" the house would collapse unless these corrective measures were taken.
In addition, plaintiff presented the testimony of Frank and Mario Lo Gatto. Frank Lo Gatto testified that he and his father were licensed mason contractors and had been consulted with respect to the preparation of an estimate pertaining to the cost of straightening the house. Based upon the architect's plans, Mr. Lo Gatto testified that it would be necessary to "lift" the house approximately one and a half feet in order to install permanent lolly columns. According to the witness, raising the house was a costly procedure requiring 20 days work and "four or five" men to complete. He further testified with respect to the necessity of installing reinforcing beams and lolly columns and pouring concrete footings. Finally, he noted that the "stairs, planter and front entrance" would have to be rebuilt. Since the witness did not personally prepare the estimate of the *280 costs of these procedures, he was not permitted to offer an opinion with regard to the actual dollar amounts.[1]
Plaintiff thus presented Mario Lo Gatto as an expert witness. Mr. Lo Gatto testified that he had been a mason contractor for some 25 years and was licensed by the state. Although the witness had never actually "lifted" a building, he was familiar with the general procedures involved. Mr. Lo Gatto was permitted to testify over defense counsel's strenuous objections. According to his testimony, it would cost approximately $37,000 to straighten the house. The witness acknowledged that his estimate was highly speculative because the nature of the work to be done depended upon the extent of the damage which could only by ascertained upon raising the house. Nevertheless, Mr. Lo Gatto testified that his opinion was based upon his review of the architect's plans with his son and his independent inspections of the house.

I
Defendant first contends that the trial judge erred in denying his motion for a new trial. Stripped to its essentials, defendant's argument is premised upon three related contentions. Defendant initially claims that the "sagging" of the house was readily apparent to the naked eye and, thus, did not constitute a "latent condition." He further contends that plaintiff was duty-bound to examine public records in the possession of the municipal building department which would have disclosed the condition of the house. Defendant also argues that the defective condition was not material to the transaction and cannot support a claim for damages. Finally, it is asserted that the jury's verdict was against the weight of the evidence. We have carefully reviewed the record and conclude that these arguments are wholly without merit.
*281 The seminal New Jersey decision pertaining to nondisclosure is Weintraub v. Krobatsch, 64 N.J. 445 (1974). There, our Supreme Court held that deliberate concealment of a latent defective condition material to the transaction constitutes sufficient grounds to justify rescission of a contract to purchase realty. Since rendition of that opinion, this principle has been expanded to permit recovery of monetary damages and has been applied in a broad variety of circumstances. See e.g., Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619 (1981); Carlsen v. Masters, Mates & Pilots Pension Plan, 80 N.J. 334 (1979); Environmental Protection Dep't. v. Ventron Corp., 182 N.J. Super. 210 (App.Div. 1981), modified 94 N.J. 473 (1983); Neveroski v. Blair, 141 N.J. Super. 365 (App.Div. 1976); Berman v. Gurwicz, 178 N.J. Super. 611 (Ch.Div. 1981); Tobin v. Paparone Const. Co., 137 N.J. Super. 518 (Law Div. 1975). The rule rests upon modern concepts of justice and fair dealing which recognize that purposeful concealment can be as destructive as an affirmative false statement. To support a claim, however, the defective condition must be latent and not reasonably observable to the purchaser. Weintraub v. Krobatsch, supra 64 N.J. at 455-456. Further, the nondisclosure must be significant. Stated somewhat differently, "[m]inor conditions which ordinary sellers and purchasers would reasonably disregard as of little or no materiality in the transaction would clearly not call for judicial intervention." Id. at 455.
Our review of the record convinces us that the evidence presented was sufficient to satisfy those requisites. The jury could reasonably have found that the tilting of the house was not observable or readily apparent. Surely, plaintiff's testimony was susceptible to that construction. Although the issue was hotly contested, the jury obviously resolved questions of credibility in plaintiff's favor. The fact that examination of certain public records would have revealed the defective condition is largely inconsequential. One who engages in deliberate concealment may not urge that his victim should have been more circumspect or astute. Jewish Center of Sussex Cty. v. *282 Whale, supra, 86 N.J. at 626, n. 1. See also Pioneer Nat'l Title Ins. v. Lucas, 155 N.J. Super. 332, 342 (App.Div. 1978), aff'd 78 N.J. 320 (1978); Berman v. Gurwicz, supra 178 N.J. Super. at 620-622; Restatement, Torts 2d § 540 (1977). Equally unavailing is defendant's claim that the defective condition was not material to the transaction. The trial record clearly discloses that the deteriorating foundation substantially impaired the value of the house. Nor can we say that the jury's verdict was against the weight of the evidence. Viewing the record in its entirety, the jury's verdict as to liability was not so distorted and wrong in an objective sense as to manifest a plain miscarriage of justice. Carino v. Novotny, 78 N.J. 355, 360 (1979); Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969). The trial judge correctly denied defendant's application for a new trial with respect to the issue of liability.

II
Defendant next contends that Mario Lo Gatto was not properly qualified as an expert and that his testimony constituted a mere "net opinion." We disagree with both contentions. We note that expertise may be acquired by occupational experience. Rockland Elec. Co. v. Bolo Corp., 66 N.J. Super. 171, 176 (App.Div. 1971). Further, the qualifications of an expert witness are generally addressed to the discretionary determination of the trial judge. Spiegle v. Seaman, 160 N.J. Super. 471, 478 (App.Div. 1978). Here, the record plainly supports the trial court's decision. As noted previously, Mr. Lo Gatto was a mason contractor for some 25 years. He was licensed by the state. His services entailed construction of foundations. Although he had never "lifted" a house, he was generally familiar with the appropriate procedures. Providing estimates constituted a part of his every-day business. We cannot say that the trial court abused its discretion in determining Mr. Lo Gatto's expert qualifications.
*283 We are also unpersuaded by defendant's contention that Mr. Lo Gatto's opinion was so speculative and conjectural as to compel its exclusion. We emphasize that the nature and extent of the corrective procedures necessary to cure the defective condition could not be established until the work commenced. We cannot reasonably expect prescience on the part of plaintiff's expert. Further, Mr. Lo Gatto's testimony cannot be considered in a vacuum. Rather, his opinion was obviously based upon the architect's plans and the procedures described by his son. We cannot say that his testimony consisted solely of "bare conclusions unsupported by factual evidence." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). See also Johnson v. Salem Corp., 97 N.J. 78, 89-91 (1984); Stanley Co. v. Hercules Powder Co., 16 N.J. 295, 305 (1954). The trial judge did not commit error in that regard.

III
Although we are satisfied that the verdict with respect to liability was entirely proper and was supported by the evidence, we are convinced that the damages awarded were excessive because the jury was improperly instructed in that regard. We are not unmindful of our Supreme Court's repeated admonition that judicial interference with the quantum of damages is unwarranted unless it is so disproportionate to the wrong committed and the resulting loss as to shock the conscience. See e.g., Baxter v. Fairmont Food Co., 74 N.J. 588, 595 (1977); Sweeny v. Pruyne, 67 N.J. 314, 315-316 (1975); Taweel, et al v. Starn's Shoprite Supermarket, 58 N.J. 227, 236 (1975). This much conceded, the jury's award here goes far beyond what is reasonably necessary to compensate plaintiff for her loss and, thus, constitutes a clear miscarriage of justice. That this is so is best evidenced by the practical effect of the verdict. The stark reality is that defendant will be compelled to part with his property and pay plaintiff the additional sum of $8000. Moreover, plaintiff will enjoy a windfall. She will be placed in a pecuniary position far better than that for which she *284 bargained. In essence, the damages awarded by the jury, according to plaintiff's expert witnesses, will be sufficient to provide her with a completely renovated, if not new, home, with a fully reconstructed foundation, entranceway, enclosed porch, planter and basement floor. Additionally, the inside walls will be replastered and completely new windows and sheetrock will be installed. While we harbor little sympathy for defendant, we believe that such a result is unduly harsh.
The appropriate measure of damages in a fraud or concealment case is a perplexing problem and has been the source of much litigation and concern. See e.g., Zeliff v. Sabatino, 15 N.J. 70 (1954); Schwartz v. Rothman, 1 N.J. 206 (1948); Crater v. Benninger, 33 N.J.L. 513 (E & A 1869). See also Prosser, Torts § 105 at 685 (4th ed. 1971). Most decisions have focused upon the conflict between the "out-of-pocket" and "benefit-of-the-bargain" rules. Under the "out-of-pocket" principle, recovery is permitted for the difference between the price paid and the actual value of the property acquired. See Crater v. Benninger, supra; Duffy v. McKenna, 82 N.J.L. 62 (Sup.Ct. 1912). The "benefit-of-the-bargain" rule allows recovery for the difference between the price paid and the value of the property had the representations been true. Batura v. McBride, 75 N.J.L. 480 (E & A 1907). Neither formula was employed in this case. Rather, the trial court merely charged the jury that the reasonable costs of repairs were recoverable if they naturally flowed from defendant's misconduct. We note in that regard that the trial judge expressed serious misgivings pertaining to his instructions regarding damages. His concern was based upon the fact that the cost of repairs far exceeded the bargained for contract price and the probable market value of the property. Although defendant's attorney did not interpose a timely objection to the court's charge, he initially requested that the jury be instructed with respect to the "out-of-pocket" formula.
On appeal, defendant continues to maintain that plaintiff should have been awarded the difference between the *285 contract price and the value of the property acquired. While we are satisfied that compensatory awards may fairly be measured by the reasonable costs of repairs in certain cases, see Environmental Protection Dep't. v. Ventron, supra, 182 N.J. Super. at 228; Tobin v. Paparone, supra 137 N.J. Super. at 530, we agree that to do so here would lead to an incongruous and unjust result. Although specific rules regarding damages in fraud cases are formulated for sundry purposes, they must be subordinated to the basic objective of making the injured party whole. 525 Main St. Corp., v. Eagle Roofing Co., 34 N.J. 251, 254 (1961). Hence, "a given formula is improvidently invoked if it defeats a common sense solution." Ibid. We are thus convinced that the cost of repairs approach should not be employed where, as here, it would result in "unreasonable economic waste." Id. at 255. See 5 Corbin Contracts § 1090, p. 493-496 (1951). In a somewhat related context, other jurisdictions have recognized alternative measures of damages where the cost of repairs or reconstruction is excessive. See Levesque v. D & M Builders, Inc., 170 Conn. 177, 365 A.2d 1216 (Sup.Ct. 1976); Farny v. Bestfield Builders, Inc., 391 A.2d 212 (Del.Super. 1978); Brewer v. Custom Builders Corp., 42 Ill. App.3d 668, 1 Ill.Dec. 377, 356 N.E.2d 565 (App.Ct. 1976); Gadbois v. Leb-Co Builders, Inc., 458 A.2d 555 (Pa.Super. 1983). The economic waste doctrine has its origin in compelling considerations of equity and justice, and is justified on the ground that although damages measured by diminution in value may not be sufficient to place the injured party in the same physical position as would proper performance of the contract, his pecuniary status will be substantially as good.
We are convinced that these principles are fully applicable here. By virtue of the age of the building and its present condition, the cost of reconstruction is not an appropriate measure of plaintiff's loss. This is so because the cost of repairs vastly exceeds the contract price and the probable market value of the property. It would be anomalous to compel defendant to provide plaintiff with what essentially *286 amounts to a totally refurbished home, which would be a result far exceeding what is necessary to make plaintiff whole. Rather, the diminution in value caused by defendant's deceit better reflects plaintiff's actual loss and satisfies the reasonable expectations of the parties. The judgment as to the award of compensatory damages, therefore, must be reversed. The matter is remanded for a new trial with respect to compensatory damages. We perceive no reason to disturb the jury's finding pertaining to punitive damages, however. Specifically, there is no reason to believe that the jury's conclusions in that regard were infected by virtue of the instructions pertaining to compensatory damages. See Terminal Const. Corp. v. Bergen Cty., etc., Dist. Authority, 18 N.J. 294, 341 (1955); Corridon v. City of Bayonne, 129 N.J. Super. 393, 398 (App.Div. 1974); Warshany v. Supermarkets General Corp., 161 N.J. Super. 515, 520 (Law Div. 1978). Accordingly, the judgment imposing liability on defendant is affirmed. So much of the judgment as awards plaintiff $33,000 in compensatory damages is reversed. The matter is remanded for a new trial with respect to the issue of compensatory damages.
NOTES
[1] Plaintiff did not cross appeal and, thus, we have no occasion to consider whether the trial judge erred in that regard.