899 A.2d 1018 (2006)
386 N.J. Super. 177
ST. LOUIS, L.L.C., Plaintiff-Respondent,
v.
FINAL TOUCH GLASS & MIRROR, INC., Defendant-Appellant, and
Final Touch Glass & Mirror, Inc., Third-Party Plaintiff,
v.
James Kissane, Registered Architect, Doug Wolf t/a Aurora Constructors, and John Boulton, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 2006.
Decided June 12, 2006.
*1019 Peter A. Gaudioso, Morristown, argued the cause for appellant (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Mr. Gaudioso, of counsel and on the brief).
James E. Mackevich, Clark, argued the cause for respondent (Mackevich Burke & Stanicki, attorneys; Mr. Mackevich, on the brief).
Before Judges CONLEY, WEISSBARD and WINKELSTEIN.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
In this opinion, we examine the appropriate measure of damages for defective construction. Plaintiff St. Louis, L.L.C., which was formed by John Boulton and his wife Prudence Boulton, purchased a forty-eight-acre tract of land located in a canal preservation district in Franklin Township in 1993. The Boultons worked with an architect, James Kissane, to develop plans to construct a two-story, 36,000 square foot house on the property with the exterior walls made of glass. The house was to be used initially as a residence and then in connection with the Boultons' child advocacy foundation. The house cost approximately $8.5 million to construct.
Boulton[1] acted as the general contractor for construction of the house. He hired Doug Wolf to serve as the construction manager and Final Touch Glass & Mirror, Inc., to install the glass.
The house's drain pipes, vent pipes, and electrical raceways were to be contained within steel columns that would serve as the support for the house. While affixing the glass panels to the steel columns with screws, Final Touch punctured nearly all of the pipes contained within the columns. Plaintiff brought suit against Final Touch, which asserted third-party complaints for contribution against Boulton, Kissane and Wolf. Wolf defaulted. While the lawsuit was pending, plaintiff sold the house for $2.5 million. At trial, the judge ruled that the appropriate measure of damages would be diminution in value of the house and the cost of repair could be considered by the jury in making that assessment. Boulton and plaintiff's construction cost expert testified that the defects would cost at least $774,000 to repair.
The jury returned a $737,500 verdict in favor of plaintiff. It assessed percentages of negligence as follows: Final Touch forty percent; Wolf sixty percent; Boulton and Kissane zero percent.[2] The court denied *1020 Final Touch's motion for judgment notwithstanding the verdict or for a new trial. On appeal, defendant raises the following issues:
POINT I
THIS COURT SHOULD VACATE THE VERDICT AND DISMISS ST. LOUIS' COMPLAINT BECAUSE ST. LOUIS FAILED TO PRESENT COMPETENT EVIDENCE OF DAMAGES AS A MATTER OF LAW.
A. The Law Division Should Not Have Permitted St. Louis to Use Cost of Repair as a Measure of Diminution of Value.
B. Even if Cost of Repair was Used Properly as Evidence of Diminution of Value, The Law Division Erred in Permitting Boulton to Testify that the Cost of Repair Was Equal to or Less than the Diminution of Value.
POINT II
THIS COURT SHOULD ENTER JUDGMENT AGAINST ST. LOUIS NOTWITHSTANDING THE VERDICT BECAUSE THE COMPARATIVE NEGLIGENCE LAW BARS ITS RECOVERY.
A. Final Touch Preserved the Right to Ask for a Molded Verdict.
B. The Evidence Adduced at Trial Establishes a Principal/Agent Relationship Between St. Louis and Wolf, Through Which Wolf's Negligence is Imputed to St. Louis.
C. Imputation of Wolf's Negligence to St. Louis Bars St. Louis's Recovery as a Matter of Law.
POINT III
IN THE ALTERNATIVE, THIS COURT SHOULD ORDER A NEW TRIAL IN RESPECT OF PLAINTIFF, FINAL TOUCH, DOUG WOLF, AND JOHN BOULTON BECAUSE THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
We affirm.

I.
The exterior walls of the house are made of large, glass panels that are supported by steel columns between the panels. The house comprises 36,000 square feet on two levels, each fourteen feet high; one level is below ground and one level is above ground. The house is approximately 400 feet long and between 15 and 65 feet wide at varying points. It took over three years to reach substantial completion.
As general contractor, Boulton hired approximately 150 suppliers and subcontractors. Although he was at the job site daily, he did not tell the subcontractors how to do their jobs but instead relied on their specialized expertise.
Wolf, as construction manager, was responsible for scheduling the work of the subcontractors and vendors. His contract required him to ensure that the subcontractors achieved satisfactory performance and quality. Like Boulton, he was at the construction site daily. The proverbial "buck," however, stopped with Boulton regarding project decision-making and payments to subcontractors.
The house has a flat rubber membrane roof, tapered to channel water off. A slope leads water to the roof drains that are located on the perimeter of the roof edge. Because the house was designed with no walls or columns inside, the roof drain pipes, which are three-inch PVC pipes, were placed in twenty of the exterior steel columns. The drain pipes run from the roof drains through the inside of the columns, through a concrete apron surrounding the building, and extend twelve feet out on the lawn.
*1021 In addition to the twenty PVC roof drain pipes in the exterior columns, twenty other columns contain plumbing vent pipes. The vent pipes are approximately one and one-half to two inches in diameter and exit into the middle of the roof. These pipes travel through the rubber membrane insulation and metal decking and then run parallel to the roof line until they enter the columns. They proceed down the columns, into the building's concrete floor, and then connect to the building's sewer system in the basement. Two additional exterior columns are used as raceways for electrical circuits.
Because the house's exterior walls are comprised of glass, the project required contractors skilled in glass installation. In August 1998, several glass vendors visited the job site to build "mockups" to provide a visual idea of what the building would look like with glass panels. When Final Touch first arrived at the job site in the summer of 1998 to perform a mock-up, Boulton was concerned primarily with the house's aesthetics. He was not concerned at that time about how the glass would be affixed to the building; thus, he did not discuss with Final Touch the type of fasteners Final Touch would use to install the glass panels. As recognized by Steve Bybel, president and owner of Final Touch, the project was still in development, and the aluminum extrusions that would hold the glass had not yet been designed.
According to Bybel, Final Touch selected and used the type of screw during the mockup that it used in the final installation one year later. The screws had to be installed several pitches of thread beyond the bit so the full width of the screw would engage sufficiently to anchor the glass frames. Bybel said he showed the screws to Boulton and Wolf; neither mentioned that they might cause problems with the pipes in the columns.
In September 1998, Wolf and William Cornish, a worker hired by plaintiff, made cutouts in the steel columns where the PVC drain pipes were to be installed. Wolf marked the columns in which the cutouts were to be placed with spray paint. Subcontractors subsequently installed the PVC drain and vent pipes and electrical raceways in the steel columns. Cornish could not recall whether the columns containing the vent pipes and electrical raceways had been marked.
Final Touch began its glass installation work in August or September 1999. Its responsibilities included measuring the rectangles formed by the floor, ceiling, and vertical columns; fabricating four-sided aluminum window frames to fit those rectangles; attaching the window frames to the columns; and installing the five foot by fourteen foot glass panels within the window frames. It was responsible for providing the screws to attach the window frames to the columns. According to Boulton, Bybel told him that two sizes of screws were ordered, shorter screws for the "wet columns"those that contained pipeand longer screws for the rest. After installation, Final Touch was to install decorative aluminum components to cover the remaining portions of the columns.
Instead of using shorter screws for all of the wet columns, Final Touch utilized a multitude of different screw sizes and types. The screws used to affix the frames to the steel columns punctured every drain pipe, all but one of the vent pipes, and both electrical raceways. As a result, when it rained water leaked out of the pipes into the house.
Boulton claimed that when Allan Lon McLean, Final Touch's project foreman, arrived at the job site, he informed McLean that certain columns contained pipes. He showed McLean that the columns containing drain pipes were marked and could *1022 be seen extending onto the lawn. Boulton also testified that he told McLean that the columns containing vent pipes and electrical raceways were marked. Boulton gave a jobsite tour to Bybel before Final Touch began its work, and pointed out the paint marks and presence of the pipes.
Boulton testified that during project meetings he reminded Final Touch to be careful of the wet columns. Cornish confirmed that he heard both Boulton and Wolf warn Final Touch to be careful of the columns containing pipes. According to Boulton, he offered to make a copy of the project plans for McLean, but McLean said he did not need them.
In contrast to Boulton's testimony, Bybel testified that when Final Touch arrived on the job no one informed its workers that the columns contained pipes or had markings. McLean and Bybel testified that some of the columns were out of plumb and longer screws were needed in some places to ensure proper anchoring of the window frames.
According to McLean, after sixty-five to seventy percent of the frames had been installed, Wolf informed him that some of the columns in the corners contained plastic drain pipes and merely advised him to "be careful." McLean then conveyed this information to Bybel. Nonetheless, Final Touch did not alter its installation methods, and neither Boulton nor Wolf questioned the work as it progressed. Despite their admitted knowledge of the drain pipes, midway through the project, both Bybel and McLean maintained that they did not learn about the existence of the vent pipes and electrical raceways until their depositions.
While the lawsuit was pending, St. Louis began to market the house. The Boultons decided to sell the house for two reasons: Prudence Boulton had developed serious health problems that confined her to a wheelchair; and to repair the damage would require "taking the whole house apart ... and having to move somewhere else while all that was going on."
To assist with the sale, St. Louis first hired Douglas Elliman, a real estate broker for luxury residences, who set an initial listing price of $18 million. Boulton was very involved with the marketing strategy for the house; he communicated with Elliman on a daily basis and helped write advertisements and brochures. Boulton met with many of the prospective buyers and disclosed the presence of the construction defects to them, including the problems associated with the windows and drain pipes, as well as with the indoor pool and the HVAC system.[3] These meetings would often last two or three hours and would involve not only the prospective buyers but also their architects, engineers, and decorators. It was Boulton's impression that the defects "spooked people." After approximately one year, Elliman failed to generate a "solid" offer for the property.
Boulton next engaged J.P. King to conduct a public auction of the property. King performed a market analysis and believed that the property, with its defects, should sell for a price between $5 million and $8 million. King spent nearly $250,000 advertising the property, and Boulton worked directly with him and continued to personally converse with prospective buyers. A minimum bid of $3 *1023 million was established; although fifty or sixty people attended the auction, no bids were offered.
St. Louis then listed the property with a realtor, Thomas Hora. More prospective buyers were generated, and Boulton participated in further conversations with them regarding the house and its construction defects. On October 7, 2003, the property sold for $2.5 million.

II.
Prior to trial, in April 2004, Final Touch produced an expert report on property valuation prepared by appraiser Maurice Stack. In September 2004, after discovery had closed, St. Louis submitted an expert report in property valuation written by Hora. On Final Touch's motion, the judge barred plaintiff from presenting Hora as an expert as to value. Plaintiff did not appeal from that decision. The court also ruled that diminution in value would be plaintiff's measure of damages, and the cost of repair could be used as evidence of those damages.
The court conducted an N.J.R.E. 104 hearing to ascertain whether Boulton was qualified to offer lay opinion testimony about the property's value. Boulton testified that, based on his involvement in the marketing and sale of the house, he believed the construction defects decreased the value of the house because repairs would need to be done, and he informed prospective buyers of the repair costs. He conceded, however, that his opinion regarding the amount of diminution was a "guess" based on his conversations with knowledgeable individuals and with prospective buyers.
After considering the purpose of the testimony and Boulton's background and knowledge in this regard, the judge concluded:
This witness [Boulton] is not being qualified as an expert. He's not going to be qualified as an appraiser or a realtor, but he's just going to be a lay witness with some knowledge under [N.J.R.E.] 701.
It's rationally based on the perception of the witness and will assist in understanding the witness's testimony or determining a fact in issue.
....
We have here a plaintiff who was very involved in the construction of this house, the purchase of the land before that, and then the attempt to sell it. He participated in attempts to market to Elliman, to an auction house, to the people that Mr. Hora brought to the property.
He'sclearly there was a great deal of effort to try and market this property over a long period of time. And . . . Mr. Boulton was involved in that process. And apparently he has experience with respect to construction of high-end properties.
He's familiar with real estate in the metropolitan area, including high-end properties in Westchester County and in the Greenwich, Connecticut, area. So I'm satisfied that he can give his opinion as to the decrease in value.
....
[T]he witness has sufficient experience in attempting to market his own property and experience with respect to the cost of repairs to this property resulting in a diminution in value.
Over the objection of Final Touch and Kissane, the trial judge permitted Boulton to testify on this subject.
At trial, Boulton testified that the construction defects had a negative financial impact on the property. He linked the diminution in value to the cost required to repair the defects. He estimated that the repair amount was approximately *1024 $874,000, $774,000 in basic repairs and $100,000 for roof replacement.
Plaintiff offered Thomas Kelly, an expert in construction cost estimating, to provide a repair estimate for removing and replacing the punctured pipes. Kelly explained to the jury that removing the drain pipes would involve cutting holes in the roof so piping could be pulled out, as well as taking apart the concrete apron that encases the piping at the perimeter of the house. To remove the vent pipes, a section of the first floor would need to be cut out. To facilitate the pipe removal process, the glass panels would need to be removed and then reinstalled. New PVC drain, vent, and conduit lines would need to be installed, as well as a new concrete curb around the house. The rubber roof would need to be patched, or replaced if the roofing manufacturer would not warranty the patched roof. Kelly opined that the total cost of repair would be $774,653, plus an additional $200,000 if the roof required replacement.

III.
At the close of plaintiff's case, Final Touch moved for involuntary dismissal pursuant to Rule 4:37-2(b). It contended that plaintiff failed to meet its burden of proof because it did not present competent evidence as to diminution in the house's value as a result of the allegedly defective work. In other words, it claimed plaintiff's proofs failed as to damages. The court denied the motion and the trial continued. In its case, Final Touch called Stack to ascertain the market value of the property as if the house had not been impaired. He considered the house to have a "built-in incurable functional obsolescence." It was "bigger than the market is looking for." In his opinion, construction and repair costs were not appropriate measures of value because these costs were not representative of the unimpaired market value. He appraised the unimpaired market value of the property at $2.8 million.

IV.
Defendant's primary argument on appeal is that plaintiff failed to prove it was damaged by defendant's actions. We disagree.
The purpose of compensatory damages is to put the injured party in as good a position as he would have been in if performance were rendered as promised. 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961). Specific rules or formulas are "subordinate to this broad purpose" and should not be invoked if they "defeat[ ] a common sense solution." Ibid.
[T]he general rule with respect to building contracts is that the disappointed owner may recover the costs of completing the promised performance or making necessary repairs, unless under the facts it is impossible to do so or the costs of completion or repairs would constitute unreasonable economic waste, in which event reference would be made to the difference in value formula.
[Id. at 255, 168 A.2d 33.]
Whether the cost of repair or diminution in value is the measure of damages "rests in good sense rather than in a mechanical application of a single formula." Ibid. We have in the past described the appropriate measure of damages for an injury to real property as a "complex subject" that requires a response "in a great variety of ways depending upon the evidence in the particular case." Velop, Inc. v. Kaplan, 301 N.J.Super. 32, 64, 693 A.2d 917 (App. Div.1997), appeal dismissed, 153 N.J. 45, 707 A.2d 149 (1998).
Generally, either diminution in the value of the property or the reasonable cost of restoring or repairing the damage *1025 may be appropriate. Ibid.; see also Berg v. Reaction Motors Div., Thiokol Chem. Corp., 37 N.J. 396, 411, 181 A.2d 487 (1962) (recognizing that even in cases where diminution in value was found to be appropriate measure of damages, reasonable cost of repairs could be considered by jury); White v. Marshall, 83 S.W.3d 57, 62 (Mo. Ct.App.2002) (particular facts of case determine measure of damages to be used); Hensic v. Afshari Enters., Inc., 599 S.W.2d 522, 524-25 (Mo.Ct.App.1980). Damages for defective construction, whether those damages are the result of a breach of contract or negligence of the contractor, are often determined by using the reasonable cost of remedying the defects unless that cost is clearly disproportionate to the property's probable loss of value. See Chem. Waste Mgmt., Inc. v. Sims, 939 F.Supp. 599, 602 (N.D.Ill.1996); Pennington v. Rhodes, 55 Ark.App. 42, 929 S.W.2d 169, 173, 175 (1996); Williams v. Charles Sloan, Inc., 17 Ark.App. 247, 706 S.W.2d 405, 406 (1986); Gen. Ins. Co. of Am. v. City of Colo. Springs, 638 P.2d 752, 759 (Colo.1981); Willie's Constr. Co., Inc. v. Baker, 596 N.E.2d 958, 961-62 (Ind.Ct. App.1992); City of Charlotte v. Skidmore, Owings & Merrill, 103 N.C.App. 667, 407 S.E.2d 571, 580-81 (1991); Schmauch v. Johnston, 274 Or. 441, 547 P.2d 119, 122 (1976); Oelschlegel, Jr. v. Mut. Real Estate Inv. Trust, 429 Pa.Super. 594, 633 A.2d 181, 184 (1993); Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 10 P.3d 417, 421-22 (2000), rev. denied, 142 Wash.2d 1018, 16 P.3d 1266 (2001).
When a contractor breaches a construction agreement, the non-breaching party is entitled to be placed in as good a position as if the contract had been performed. 24 Williston on Contracts § 66:17 (4th ed.2002).
[U]sually this will be based on the cost to remedy any defect, rather than the diminution in value between the performance rendered and that promised. In part, this is because the former measure of recovery, in a construction contract setting, will make the owner whole that is, give the owner the benefit of the bargain that he or she made.... Thus, if a defect in the contractor's performance is repairable, the basic measure of the owner's damages is usually the cost of repair....
[Id. (footnotes omitted).]
These principles are repeated in the Restatement of Contracts.
(2) If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on
(a) the diminution in the market price of the property caused by the breach, or
(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.
[Restatement (Second) of Contracts: Alternatives to Loss in Value of Performance § 348 (1981).]
The accompanying Restatement comment provides that:
c. Incomplete or defective performance. If the contract is one for construction....
Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with reasonable certainty. In that case he can usually recover damages based on the cost to remedy the defects. Even if this gives him a recovery somewhat in excess of the loss in value to him, it is better that he receive a small windfall than that he be undercompensated *1026 by being limited to the resulting diminution in the market price of his property.
[Id., comment c (citation omitted).]
The Restatement provides an illustration:
A contracts to build a house for B for $100,000. When it is completed, the foundations crack, leaving part of the building in a dangerous condition. To make it safe would require tearing down some of the walls and strengthening the foundation at a cost of $30,000 and would increase the market value of the house by $20,000. B's damages include the $30,000 cost to remedy the defects. [Id., illustration 3.]
Against this legal and factual framework, defendant's position that plaintiff can only prove damages by showing a decrease in market value is unduly rigid. We conclude that cost of repairs is also an appropriate measure of damages. And, while the judge ruled that the measure of damages would be diminution in value, the judge ruled that the diminution in value could be established by cost of repairs. It is the evidence of those costs that we conclude proved plaintiff's damages.
Specifically, Kelly testified that the cost to repair the damages brought about by Final Touch's actions totaled $774,653, with an additional $200,000 that may be necessary if the roof required replacement. Kelly was a qualified expert and gave the why and the wherefore to support his conclusions. His testimony alone, exclusive of Boulton's value testimony, was sufficient to survive defendant's Rule 4:37-2(b) motion so as to get to the jury.
Once plaintiff survived the motion to dismiss, it became defendant's burden to challenge the valuation. See Pennington, supra, 929 S.W.2d at 175 (once injured party presents sufficient proof to get to jury on cost of repairs, burden shifts to contractor to show "(a) either that repairing the defects was unreasonable because it would have involved more destruction of quality workmanship than would have been warranted considering the value likely to be added to the house by making the repairs, or (b) that the repairs would have been disproportionate to the probable increase in value to [the injured parties] resulting from proper construction, so that difference in value would have been the proper measure of damages"); Panorama Vill. Homeowners Ass'n, supra, 10 P.3d at 422 (once injured party establishes cost to remedy defects, contractor bears burden of challenging evidence to reduce the award).
Here, when the trial continued after the judge denied defendant's motion to dismiss, defendant challenged plaintiff's damages evidence with Stack's testimony. He testified that the market value of the property as it was unimpaired was approximately $2.8 million. In other words, the diminution in value was $300,000his value of $2.8 million, less the $2.5 million plaintiff received from the sale of the property. The jury therefore had before it evidence presented by plaintiff of the house's diminution in value as evidenced by the cost of repair, $774,653, plus an additional sum to repair or replace the roof, as well as defendant's evidence of diminution in market value. The jury returned a verdict of $737,500, apparently substantially accepting plaintiff's proofs rather than defendant's.
Kelly's opinion provided reasonable support for the verdict in the context of all of the evidence. The jury was told that the house cost approximately $8.5 million to construct, and that despite intensive marketing efforts lasting more than a year, it sold for only $2.5 million. A public auction for the house did not even bring a minimum bid of $3 million. And, as noted, Final Touch's expert valued the property at $2.8 million. Indeed, he agreed that the *1027 presence of leaking pipes within a high-end house would impair its marketability and cause the value of the house to diminish. Under these circumstances, Kelly's estimate of $774,653 plus an additional sum for the roof as the cost of repairs supported the jury's $737,500 verdict.
Defendant cites to Velop, supra, 301 N.J.Super. at 65-66, 693 A.2d 917 and Correa v. Maggiore, 196 N.J.Super. 273, 285-86, 482 A.2d 192 (App.Div.1984), to carry its argument that diminution in value and cost of repair are always distinct measures of damages. Those, cases, however, involved economic waste and are not applicable to the facts here.
In Correa, supra, 196 N.J.Super. at 277-78, 482 A.2d 192, the plaintiff, who purchased a house from the defendant for $25,000, brought an action for damages allegedly caused by the defendant's deliberate concealment of latent defects in the house. The jury returned a compensatory damage award of $33,000 that reflected repair costs. Id. at 277, 279-80, 482 A.2d 192. The court reversed the damage award. Id. at 283, 482 A.2d 192. It explained that the award would be unjust to the defendant because it would provide the plaintiff with a windfall, a fully renovated, if not new, house. Id. at 283-86, 482 A.2d 192. Similarly, in Velop, supra, 301 N.J.Super. at 66, 693 A.2d 917, the defendant's evidence established that a property worth only $3,745,000 required restoration at a cost of $5,400,000. The court rejected restoration costs as a measure of damages based on the principle of avoiding economic waste. Ibid.
Thus, in Correa and Velop to tie cost of repair to diminution in value would have resulted in an economic windfall to the plaintiffs. Here, in contrast, the damage award of $737,500 is not in excess of the value of the property, nor would it permit a substantial upgrade of the house.
Defendant claims that because plaintiff sold the house, it is impossible for plaintiff to perform the repairs and plaintiff is therefore left to prove damages by showing a diminution in market value. Defendant relies, in part, on Wentworth v. Air Line Pilots Ass'n, 336 A.2d 542, 545 (D.C.1975), where, because the damaged property was sold, the court found that the plaintiff's only recourse for damages was to establish the value of the property as diminished by the injuries. The court reasoned that while the general rule was that the owner of damaged property could recover the cost to repair the damage, once the property was sold it became impractical to repair the damage, leaving the injured party to resort to the diminution in market value to redress his injuries. Id. at 544-45. Defendant also points to the language of 525 Main Street Corp., supra, which says: "[T]he general rule with respect to building contracts is that the disappointed owner may recover the cost of completing the promised performance or making necessary repairs, unless under the facts it is impossible to do so...." 34 N.J. at 255, 168 A.2d 33 (emphasis added).
We are not persuaded by defendant's argument. Taking the cases in reverse order, the 525 Main Street Court did not discuss the issue present herewhether an injured party who sells damaged real property is limited in his or her recovery to the diminution in the property's market value. To construe the Court's decision to so limit an injured party would be contrary to the Court's charge that damages standards should be flexible, so as to present a "common sense solution" that is "fair to the litigants." Id. at 254, 258, 168 A.2d 33.
Here, defendant's position would have the practical effect of penalizing plaintiff and rewarding defendant. Resorting solely to the diminished market value standard would deny plaintiff adequate compensation *1028 for defendant's actions even though plaintiff suffered harm by those actions. Such a solution would be inequitable and contrary to common sense. Cf. Dixon v. City of Phoenix, 173 Ariz. 612, 845 P.2d 1107, 1114, 1117 (Ct.App.1992) (City should not be permitted to breach contract without being required to pay for damages even if restoration costs of damaged property exceed diminution of market value); Mayfield v. Swafford, 106 Ill.App.3d 610, 62 Ill.Dec. 155, 435 N.E.2d 953, 957 (1982) (measure of damages should not penalize innocent owner and reward contractor for faulty performance). Using the cost of repair here essentially gives plaintiff what it bargained for, and does not reward defendant for its faulty construction.
For substantially the same reasons, we decline to follow Wentworth, supra, 336 A.2d at 543-45. In addition, that decision ignores the fundamental principle that in a claim for cost of repair as the result of faulty construction, a plaintiff is not required to spend the damages award to actually repair the property. See Greene v. Bearden Enters., Inc., 598 S.W.2d 649, 653 (Tex.Civ.App.1980) (no requirement that damages awarded for cost of repair be spent to make the repairs); John P. Ludington, Annotation, Modern Status as to Whether Cost of Correction or Difference in Value of Structures is Proper Measure of Damages for Breach of Construction Contract, 41 A.L.R.4th 131 (2005) (same).
Thus, we conclude that the court did not err in ruling that the cost of repair was a proper element to consider in ascertaining plaintiff's damages.
[We do not publish Parts V, VI and VII of our opinion because the guidelines for publication are not met. R. 1:36-2(d).]
Affirmed.
NOTES
[1] References to "Boulton" in this opinion are to John Boulton.
[2] Plaintiff's complaint sought damages for negligence, breach of contract and breach of warranties. The record does not contain the transcript of the jury's verdict or the verdict sheet. We are unable to determine if the jury awarded damages solely for negligence, or, in addition, for breach of contract and/or breach of warranties.
[3] Plaintiff also filed lawsuits against the pool and HVAC contractors, obtaining a judgment against the pool contractor in August 2004. In a companion appeal heard back-to-back with this appeal, we substantially affirmed the final judgment. See St. Louis, L.L.C. v. Anthony & Sylvan Pools Corp., No. A-3754-04, 2006 WL 1585739 (App.Div. June 2006). The lawsuit against the HVAC contractor is not before us.