855 F.2d 1047
 57 USLW 2248, 6 UCC Rep.Serv.2d 1424,
Prod.Liab.Rep.(CCH)P 11,897
 KING, Naaman E. and King, Marian
v.
HILTON-DAVIS, a/k/a Hilton-Davis Chemical Company, a
Division of Sterling Drug, Inc.; Terwin Chemicals, Inc.;
Hilton-Davis Group and Washburn Potato Company and Kearney,
Frank S. Sr. Frank S. Kearney, Sr. & Sons.
Appeal of HILTON-DAVIS.
 No. 87-1716.
 United States Court of Appeals,
Third Circuit.
 Argued May 2, 1988.
Decided Aug. 23, 1988.
Rehearing and Rehearing In Banc Denied Sept. 19, 1988.
 
 Louis Bell (Argued), Liebert, Short, Fitzpatrick & Hirshland, Philadelphia, Pa., for appellant.
 James H. Thomas (Argued), Blakinger, Byler, Thomas & Chillas, P.C., Lancaster, Pa., for appellee.
 Before HIGGINBOTHAM, STAPLETON, and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 This diversity action brings before us once again the problem of ascertaining the boundary between tort and contract. We find that the plaintiffs' product liability claims were for economic loss resulting from injury only to the product itself, and accordingly conclude that the principles of East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), which we predicted in Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110 (3d Cir.), cert. denied --- U.S. ----, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987), would be adopted by the Pennsylvania courts, require reversal of the district court's denial of defendant-appellant Hilton-Davis' motion for judgment N.O.V.
 
 I.
 
 2
 Naaman and Marion King are Pennsylvania farmers who run a roughly 600-acre farming operation producing, among other things, potatoes. They have been in the farming business for about 36 years. A large part of the Kings' 1983 potato crop failed; they attributed this to the fact that the bulk of the seed potatoes they had purchased that spring had been treated with a chemical by the name of Fusarex. The Kings sued Hilton-Davis, the manufacturer of Fusarex, in tort, alleging that Hilton-Davis failed to warn the Kings properly about Fusarex and that this failure to warn was not only negligent but rendered the company strictly liable as well. The jury found in favor of the Kings on both the negligence and strict liability counts. On appeal, Hilton-Davis raises a variety of challenges to the jury's verdict. We address only Hilton-Davis' argument that the character of the Kings' loss is such that no recovery for it in tort is possible under Pennsylvania law.
 
 
 3
 Seed potatoes are harvested in fall and stored over the winter, then cut up and planted in the spring. Stored seed potatoes should not be allowed to sprout; they will generally remain dormant naturally, putting out no sprouts, if kept at certain constant, relatively low temperatures. To ensure dormancy, seed potatoes may be treated with a sprout suppressant.
 
 
 4
 Fusarex is a sprout suppressant which has been in use in the United States since the 1950s. It is a tan, clay-based powder, 94% inert and 6% active, which is applied to seed (or other) potatoes as they are put into storage. After the Fusarex powder is put on the potatoes, its active element slowly forms a gas which surrounds the potatoes. It is this gas which inhibits sprouting, though just how it does so is not known. Come spring, the seed potatoes are removed from storage, cut up, and planted. If the remaining Fusarex is not to some extent--precisely how much is also not known--removed from the seed potatoes before planting, sprouting may continue to be inhibited, so that the planted seed potatoes may not sprout at all or may not grow well if they do sprout. The remaining Fusarex is removed by ventilation.
 
 
 5
 In fall of 1982, the Kings contracted with Washburn Potato Company, a potato dealer located in Maine, to buy Katahdin seed potatoes for the 1983 season. As was its usual practice, Washburn had at that time not yet made any arrangement concerning who would actually supply the seed potatoes to be sold to the Kings, instead waiting to see which supplier would have a good-quality crop of the desired potato variety available in early 1983. Some of Washburn's suppliers treated their seed potatoes with Fusarex, and others did not. In general, between 70% and 75% of seed potato growers use Fusarex on some part of their crops. The Maine grower who eventually supplied the Kings' seed potatoes, Mr. Kearney, had treated his potatoes with Fusarex before putting them into storage in the fall of 1982. Kearney bought the Fusarex he used from Hilton-Davis.
 
 
 6
 The rate of application recommended for Fusarex by Hilton-Davis is one pound of the chemical per 600 pounds of potatoes. This application rate results in a whole-potato concentration of 100 parts per million. The FDA allows a whole-potato Fusarex concentration of 25 ppm in food. Because Kearney had in prior years obtained proper sprout suppression using considerably less Fusarex than recommended by the manufacturer, in fall of 1982 he applied to his seed potatoes only three pounds of Fusarex per 14,000 pounds of potatoes. This resulted in a whole-potato concentration of 15 ppm at the time the Kings bought the seed potatoes. The parties stipulated that at the time of planting, the seed potatoes had a whole-potato concentration of .71 ppm of Fusarex, and a peel concentration of between 4.8 and 6.8 ppm.
 
 
 7
 At the time he collected his seed potatoes from Kearney, Mr. King was provided by Kearney with a state certificate of inspection upon which was noted the fact that the potatoes had been treated with Fusarex. King testified that he was not familiar with Fusarex at that time and assumed that its sole purpose was to prevent rot. Conflicting evidence was presented at trial as to whether Kearney and King discussed Fusarex and whether Kearney gave King a Fusarex bag complete with label.
 
 
 8
 The Kings annually devote about 150 acres of their land to potatoes; between April 27th and May 4th of 1983, they planted about 96 of these acres with the Fusarex-treated seed potatoes bought from Washburn and supplied to Washburn by Kearney. Two-thirds of this planting completely failed to sprout, and the third that did sprout ultimately gave a very poor yield.
 
 
 9
 The Kings brought suit against Hilton-Davis, Washburn, and Kearney over this crop failure. The Kings sued Hilton-Davis and Washburn both in tort, based on theories of strict liability and negligence, and in contract, based on breach of warranty. The suit against Kearney was dismissed for lack of personal jurisdiction. The action against Hilton-Davis and Washburn went to trial, and the jury returned a verdict in favor of the Kings against both defendants. The jury found Hilton-Davis 85% negligent and strictly liable; it found Washburn 15% negligent, but not liable for breach of warranty. The breach of warranty claim against Hilton-Davis was not submitted to the jury and the Kings did not object to this omission.
 
 
 10
 Both defendants moved for judgment N.O.V. or, in the alternative, a new trial. The district court granted Washburn's motion for judgment N.O.V. based on an exculpatory clause in Washburn's contract with the Kings,[1] but sustained the jury verdict against Hilton-Davis. Because the only issue we address in this appeal is whether the Kings' recovery in tort is barred as a matter of Pennsylvania law, our review is plenary. Aloe Coal, 816 F.2d at 116.II.
 
 
 11
 Our starting point is East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In that case the Court, sitting in admiralty, unanimously held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871, 106 S.Ct. at 2302. In Aloe Coal, 816 F.2d at 118, this court predicted that the Pennsylvania Supreme Court would adopt the rationale and conclusions of East River to bar a purchaser's recovery in tort from his or her seller for economic loss.[2] Because the reasoning of the Supreme Court in East River is crucial to determination of the correct result here, we quote at some length from that opinion. We begin with the Court's statements that:
 
 
 12
 Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty.... It is clear, however, that if this development were to progress too far, contract law would drown in a sea of tort....
 
 
 13
 The paradigmatic products-liability action is one where a product "reasonably certain to place life and limb in peril, ..." causes bodily injury....
 
 
 14
 For similar reasons of safety, the manufacturer's duty of care was broadened to include protection against property damage.... Such damage is considered so akin to personal injury that the two are treated alike....
 
 
 15
 In the traditional "property damage" cases, the defective product damages other property. In this case, there was no damage to "other" property. Rather, the first, second, and third counts allege that each supertanker's defectively designed turbine components damaged only the turbine itself. Since each turbine was supplied by Delaval as an integrated package, ... each is properly regarded as a single unit.... Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury suffered--the failure of the product to function properly--is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.
 
 
 16
 476 U.S. at 866-68, 106 S.Ct. at 2299-2300.
 
 
 17
 The Supreme Court went on to conclude that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." 476 U.S. at 871, 106 S.Ct. at 2302. The Court gave four primary reasons for this conclusion. First, the "tort concern with safety is reduced" where no personal injury or property damage has occurred; the commercial user stands to lose only the benefit of its bargain. Id. Second, the maintenance of product value and quality is the traditional function of express and implied warranties and the law of such warranties "sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain," thereby placing it in the same position it would have been in if the product had functioned properly. Id. at 873, 106 S.Ct. at 2303. Third, in this context, there is no justification for interference with private allocation of the risk of injury to the product itself. And, finally, it is more desirable and ultimately less expensive to have liability for injuries to a product itself limited by the principles applicable to warranty claims than to subject a manufacturer to tort damages of an indefinite amount; while warranty liability can be contractually disclaimed and is limited by the "requirements of foreseeability and of privity," tort liability is considerably more difficult to contractually circumscribe and is not limited by foreseeability and privity. Id. at 874, 106 S.Ct. at 2304.
 
 
 18
 With respect to the last of these points, the Supreme Court observed:
 
 
 19
 A warranty action ... has a built-in limitation on liability, whereas a tort action could subject the manufacturer to damages of an indefinite amount. The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach.... In a warranty action where the loss is purely economic, the limitation derives from the requirements of foreseeability and privity, which is still generally enforced for such claims in a commercial setting.
 
 
 20
 * * *
 
 
 21
 In products-liability law, where there is a duty to the public generally, foreseeability is an inadequate brake.... Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product.
 
 
 22
 Id.
 
 
 23
 The plaintiffs in East River were bareboat charterers of ships powered by the defective turbines manufactured by the defendant. They had chartered for 20-year terms from the vessel owners, which had purchased the vessels from the shipbuilding firm to which the defendant had supplied the turbines. Accordingly, in East River, as in this case, the plaintiffs and the defendants were remote in the production and distribution chain and the defendant sold something less than the plaintiffs leased or purchased. In East River, however, the only property damage caused by the defect was damage to the property supplied by the defendant to the shipbuilder, the turbines. Here the defect in the Fusarex sold by the defendant, after being applied by Kearney, rendered the seed potatoes less valuable as seed potatoes. As a result, this case presents a threshold issue that East River did not: In determining whether a product "injures only itself" for purposes of applying the East River rule in a context like this, does one look to the product sold by the defendant or to the product purchased by the plaintiff? We conclude that one must look to the product purchased by the plaintiff. We also conclude that the district court, while it correctly looked to what the plaintiff purchased rather than to what Hilton-Davis sold, erred in finding that the seed potatoes constituted "other property" and, accordingly, that this was not a case involving only economic loss.
 
 
 24
 As we read East River, it is the character of the plaintiff's loss that determines the nature of the available remedies. When loss of the benefit of a bargain is the plaintiff's sole loss, the judgment of the Supreme Court was that the undesirable consequences of affording a tort remedy in addition to a contract-based recovery were sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims. The relevant bargain in this context is that struck by the plaintiff. It is that bargain that determines his or her economic loss and whether he or she has been injured beyond that loss. Moreover, the East River analysis dictates that where the purchaser of a defective product sues the manufacturer from whom he or she has purchased the product, rather than a supplier of components for the product, the relevant product is what the plaintiff bargained for and the remedy is limited to a contract-based recovery. We perceive no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product. This counsels against looking to the component part to define the product and "economic loss." As the Court of Appeals for the Fifth Circuit recently observed:
 
 
 25
 We see no rational reason to give the buyer greater rights to recover economic losses for a defect in the product because the component is designed, constructed, or furnished by someone other than the final manufacturer. The buyer ordinarily has no interest in how or where the manufacturer obtains individual components. The buyer is usually interested in the quality of the finished product, and is content to let the manufacturer decide whether to do all the work or delegate part of it to others.
 
 
 26
 825 F.2d 925, at 929.
 
 
 27
 Our conclusion is supported by the federal appellate court decisions that have passed upon the tort liability of a component part manufacturer for economic loss. In Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925 (5th Cir.1987) (admiralty), for example, the court held that in the context of a tort claim for economic loss, the "product" means "the finished product bargained for by the buyer" rather than the individual components of that product. 825 F.2d at 930. The Shipco court therefore held that the plaintiff could maintain its tort claim for economic loss neither against the company which had supplied the contracted-for product nor against the company which had supplied the defective component of that product. The plaintiff's remedies were limited to a contract action against the company which had sold the plaintiff the finished, bargained-for product. Similarly, in American Home Assurance Co. v. Major Tool & Machine, Inc., 767 F.2d 446 (8th Cir.1985) (applying Minnesota law), the court held that a turbine assembler could not recover in tort from manufacturers of defective component parts of the turbine on the theory that the defective components damaged "other property," i.e., the remainder of the turbine. In the court's view, "other property" would not include other parts of a single product fabricated under a series of subcontracts. And in Airlift Int'l, Inc. v. McDonnell Douglas Corp., 685 F.2d 267, 270 (9th Cir.1982) (applying California law), the court dismissed product liability claims against the manufacturer of a component part of an airliner as well as against the manufacturer of the airliner, on the ground that the allocation of risk contracted for by the purchaser and the airliner manufacturer would be nullified if the purchaser could recover from the component-part manufacturer. See also County of Westchester v. General Motors Corp., 555 F.Supp. 290, 292 (S.D.N.Y.1983) (applying New York law) (rejecting argument that damage to air conditioning condensers caused by defective design and redesign of air conditioning system constituted damage to other property that would support a tort claim against the designing corporation); Cedars of Lebanon Hospital Corp. v. European X-Ray Distributors, Inc., 444 So.2d 1068, 1071-72 (Fla.App.3d Dist.1984) (applying Florida law) (affirming dismissal of tort claims for economic loss against component part manufacturer).
 
 
 28
 Focusing on the Kings' bargained-for expectations, we hold that the relevant product in this case "injured only itself." The Kings contracted to buy a single integrated product, seed potatoes. Like many agricultural products, seed potatoes may be treated with a multitude of chemicals for a multitude of purposes; the end result of this treatment is intended to be a single product--in this case a disease-free, pest-free seed potato that is capable of producing healthy plants. The Kings lost the expected performance of the seed potatoes, no more and no less.[3]
 
 
 29
 Although it is true, as the district court stressed, that application of Fusarex to ensure the dormancy of seed potatoes is not necessary, we do not think it appropriate to look to the necessity of including a particular part in a product in determining whether or not the part should be considered a separate product. The fact that Kearney might have opted not to use Fusarex on his potatoes does not lead to the conclusion that the Fusarex cannot form part of an integrated package of treated seed potatoes.[4]
 
 
 30
 Having concluded that the teachings of East River foreclose tort liability in the context of this case, the remaining issue is whether we believe the Supreme Court of Pennsylvania would accept those teachings in this context. In Aloe Coal, we predicted that the Supreme Court of Pennsylvania would decline to follow a course that would severely restrict the ability of parties in commercial transactions to allocate the risk of purely economic losses and would leave a manufacturer with an open-ended and indefinite liability for such losses. The only factual difference between Aloe Coal and this case is that the plaintiff in Aloe Coal was attempting to recover economic loss from a manufacturer from whom it purchased directly, while the plaintiff here seeks to recover such loss from a component supplier who is remote from the plaintiff in the production and distribution chain. While we find a portion of the relevant Pennsylvania law uncertain, given the policy judgments we have predicted the Pennsylvania Supreme Court would adopt, we conclude that this factual distinction would not produce a different result.
 
 
 31
 We find Pennsylvania law unclear on the issue of whether a plaintiff who has suffered economic loss can recover for breach of a warranty of merchantability from a party with whom it is not in privity. The Supreme Court of Pennsylvania has suggested by way of dicta that a showing of privity may not be required. Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848, 854-55 n. 7 (1968). More recently, the Superior Court has held that lack of privity defeats a claim for economic loss under a theory of implied warranty. Johnson v. General Motors Corp., 349 Pa.Super. 147, 502 A.2d 1317, 1320 (1986) (warranty protection has not been extended to persons other than the buyer who do not sustain personal injury, and argument that such protection ought to be extended should be addressed to the legislature rather than the courts), app. denied 514 Pa. 639, 523 A.2d 346 (1987). See also Manor Junior College v. Kaller's, Inc., 352 Pa.Super. 310, 507 A.2d 1245, 1249 (1986) (privity still required for common law breach of warranty claim). In these circumstances, we will make alternative assumptions about this issue in our analysis.
 
 
 32
 If the Pennsylvania Supreme Court ultimately holds that privity is not required for a breach of warranty recovery where only economic loss is involved, we would expect it to also hold that warranty liability to someone remote in the chain can be disclaimed or limited under the provisions of the U.C.C., without an express contract with the remote party, so long as the disclaimer or limitation is clearly communicated to the remote party prior to his or her purchase.[5] Under this set of assumptions, if a tort remedy is denied in accordance with East River, a remote purchaser in Pennsylvania will have a satisfactory alternative remedy against the manufacturer of the product or a component thereof. That warranty remedy, while not subject to the limitation of the privity doctrine, will remain limited by a foreseeability requirement and will be subject to limitation and disclaimer under the U.C.C.[6] Thus, if the East River rule is applied in this context, private risk allocation will be preserved and manufacturers of products or components thereof will not be exposed to open-ended and indefinite liability. If tort recovery is permitted, however, it will be impossible for such manufacturers to control their exposure to liability for economic loss, and the economic consequences of indefinite exposure found undesirable in East River will follow.
 
 
 33
 Assuming that the Supreme Court of Pennsylvania ultimately holds privity to be an essential element of a warranty claim for economic loss, if tort liability is denied in accordance with East River, a purchaser in the position of the Kings will not have a satisfactory alternative remedy against a party in Hilton-Davis' position. There will, however, be a warranty claim against the immediate seller that, assuming the continuing financial responsibility of the seller, will give the purchaser the benefit of its bargain. This is precisely the situation that confronted the Supreme Court in East River. The Court there expressly noted that the charterers had no warranty claim against the turbine manufacturer and, as we have noted, affirmatively relied upon the "limitation of privity" when opting in favor of warranty as the exclusive remedy. Implicit in the East River decision is the policy judgment that in a commercial context the possibility of an inadequate recovery occasioned by bankruptcy, a commercial risk that a purchaser assumes in choosing a seller, does not justify permitting a tort recovery that will allow a purchaser to reach back up the production and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising that chain.
 
 
 34
 Based upon the foregoing, we predict that the Supreme Court of Pennsylvania would apply the East River rule in this context as well as the situation before the Court in Aloe Coal.
 
 III.
 
 35
 Because we conclude that the Supreme Court of Pennsylvania would not permit recovery from a component part supplier under a negligence or strict liability theory for economic loss resulting from a defective product damaging only itself, we cannot uphold the judgment entered in the district court against Hilton-Davis. We therefore reverse the denial of Hilton-Davis' motion for judgment N.O.V., and remand these proceedings to the district court so that it may enter judgment N.O.V. for Hilton-Davis.
 
 
 
 [1]
 The district court, in addition to concluding that the contract expressly waived negligence claims against Washburn and that such a provision was valid under Pennsylvania law, considered whether this contract was one of adhesion which should not be given effect. The reasons for the court's conclusion that this was not a contract of adhesion were that the Kings had a large operation and were sophisticated farmers; that there were numerous other dealers from whom the Kings could have bought seed potatoes, not all of whom had exculpatory clauses in their contracts; and that the Kings had in the past used other dealers besides Washburn when Washburn could not supply what they required. The Kings initially appealed from the judgment in favor of Washburn but subsequently withdrew that appeal
 
 
 [2]
 In Aloe Coal, the purchaser of a tractor shovel sued the manufacturer alleging negligence, strict liability, and breach of warranty after the tractor shovel was destroyed in a fire the cause of which was not known. We held that the purchaser could not recover for the fire damage under product liability theory but was limited to remedies available for breach of warranty
 
 
 [3]
 In defining "the product," the Shipco court reasoned:
 The completed vessels were obviously the objects of the contract. Shipco did not bargain separately for individual components of each vessel. We are persuaded that those same vessels that were the object of the contract must be considered "the product" rather than the individual components that make up the vessels.
 825 F.2d at 928. We find this reasoning apposite here.
 Our conclusion on this point, and in this case generally, is contrary to that of the Supreme Court of Montana in Streich v. Hilton-Davis, 692 P.2d 440 (Montana 1984) (farmers able to recover in both tort and contract for crop failure found to have been caused by Fusarex). The Streich court did not have the benefit of the analysis of the Supreme Court in East River.
 
 
 [4]
 We also do not agree with the district court that the fact that the Fusarex and the seed potatoes were produced by separate entities in different locations is of significance. To have been produced under such circumstances does not make component parts any less capable of being integrated into the final product than if they had been made at the same location by the same entity that turns out that final product
 Nor are we impressed with the metaphysical argument advanced by the Kings at oral argument that the seed potatoes and the Fusarex were two separate products because the latter did not penetrate the former. In addition to being legally irrelevant, this contention is without factual foundation. It is factually indisputable that some Fusarex is absorbed by a potato to which the chemical is applied; the parties' stipulation here as to whole-potato and peel concentrations of Fusarex in the very seed potatoes bought and planted by the Kings makes that evident.
 
 
 [5]
 States that have dispensed with the requirement of privity in this context have typically held that a manufacturer can limit its warranty liability by a conspicuous provision in the literature included with the product, e.g. Sanco, Inc. v. Ford Motor Co., 771 F.2d 1081, 1087 (7th Cir.1985) (applying Indiana law), or by contracting with the dealer to include express reference for a limitation on the manufacturer's warranty liability in the dealer's contracts with its customers, e.g. Hunter v. Texas Instruments, Inc., 798 F.2d 299, 302 (8th Cir.1986) (applying Arkansas law). See also Clark v. DeLaval Separator Corp., 639 F.2d 1320, 1324 (5th Cir.1981) (under Texas law, manufacturer's disclaimer may be effective against remote purchaser where such disclaimer is included either with the product or in the contract to which the ultimate purchaser is a party)
 
 
 [6]
 U.C.C. Secs. 2-316, 2-719