964 A.2d 330 (2009)
405 N.J. Super. 288
Joseph MARRONE and Jannine Marrone, Plaintiffs-Appellants,
v.
GREER & POLMAN CONSTRUCTION, INC., t/a G.P. Construction, Inc., Garret N. Greer, Jan Polman, Lester Stucco, Defendants, and
Sto Corporation, Sto of New Jersey, Inc., Defendants-Respondents.
Greer & Polman Construction, Inc., Defendant/Third-Party Plaintiff,
v.
Selective Insurance Group, Inc., Assurance Company of America and ITT Hartford Insurance Company, Third-Party Defendants.
No. A-3651-07T2.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2008.
Decided February 4, 2009.
*331 John R. Sawyer, Lawrenceville, argued the cause for appellants (Stark & Stark, attorneys; Mr. Sawyer and Mark M. Wiechnik, of counsel and on the brief).
David N. Cohen, Madison, argued the cause for respondent STO Corp. (Edwards, Angell, Palmer & Dodge, LLP, attorneys; Mr. Cohen, Andrew P. Fishkin and Charles W. Stotter, on the brief).
Jonathan P. Zayle, Basking Ridge, argued the cause for respondent STO of New Jersey (Carroll, McNulty & Kull, L.L.C., attorneys; Guy T. Lytle, of counsel and on the brief).
Before Judges LISA, REISNER and ALVAREZ.
The opinion of the court was delivered by
*332 REISNER, J.A.D.
Plaintiffs Joseph and Jannine Marrone appeal from two orders dated July 30, 2007, granting summary judgment dismissing their second amended complaint against Sto Corporation, and Sto of New Jersey, Inc. We affirm. Plaintiffs' claims under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -184, were properly dismissed for lack of proof that any losses they suffered were the result of defendants' alleged unconscionable conduct in manufacturing or marketing an exterior home siding product. We also conclude that plaintiffs' claims based on the Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11, were properly dismissed under the economic loss doctrine because the only claimed damage was to the house, of which the siding was a component.

I
The crux of this case involves alleged defects in an exterior siding product that was applied to a house when it was constructed in 1995. Sto Corporation (Sto) and Sto of New Jersey, Inc. (Sto of NJ), were the manufacturer and distributor, respectively, of this product, which was known as Exterior Insulation Finish System (EIFS cladding). Plaintiffs were not the original owners of the house. They bought the house, located in Mahwah, New Jersey, in 2003 from the original owners, the DeCilveos, who in turn had contracted for its construction with Greer & Polman Construction (G & P). G & P subcontracted with Lester Stucco to apply the EIFS cladding; Lester obtained the material from the distributor, STO of NJ.[1]
There is no dispute that the DeCilveos had no knowledge about the EIFS cladding and did not receive or rely on any representations about it. In fact, they thought the material was stucco. The DeCilveos lived in the house for eight years without discovering any problem with the exterior cladding. Plaintiffs had no contact with either Sto or Sto of NJ and did not receive or rely on any information or representations from anyone concerning the EIFS cladding. Nor did they have a written warranty for the exterior cladding. Like the DeCilveos, they believed the exterior was stucco, which is "cement on wood." Before they bought the house, plaintiffs had it inspected by a professional home inspection company.
After they bought the home, plaintiffs allegedly received a letter from their homeowners' insurance company in November 2003, threatening to cancel their coverage because of the EIFS cladding on the house. Plaintiffs also discovered that the EIFS cladding was defective. According to their second amended complaint (complaint), the EIFS cladding was not water-tight, as it was supposed to be, thus resulting in "an unacceptably high moisture content in the underlying substructure of [plaintiffs'] home, causing damage thereto." In their complaint, as it related to the Sto defendants, plaintiffs asserted claims for negligent manufacture and distribution of the EIFS; breach of express and implied warranties; negligent misrepresentations and omissions; intentional misrepresentations or omissions in violation of the CFA; and strict liability under the PLA.
A September 2005 expert report provided to plaintiffs by R.V. Buric indicated that the construction contractor had improperly installed the EIFS cladding. However, Buric also opined that the EIFS system *333 was poorly designed because it depended on the applied cladding being perfectly water-tight and had no back-up system to carry moisture away from the exterior walls if water penetrated behind the cladding. Buric found damage to the EIFS cladding itself, as well as water damage to sheathing and wood framing and to some windows.[2]
The motion judge granted summary judgment dismissing the complaint. In two written opinions issued July 30, 2007, he agreed with defendants' contentions, which plaintiff did not oppose, that Sto did not issue a written warranty and plaintiffs' implied warranty claim was barred by a four-year statute of limitations. Addressing the intentional misrepresentation claim, the judge found no evidence that plaintiffs "ever received and/or saw and/or reviewed and/or relied upon and/or considered, to their detriment, any representations of any kind" concerning the EIFS product. Moreover, plaintiffs had no "special or fiduciary relationship" with Sto which would provide a basis to infer that Sto had a "duty to make disclosures" to plaintiffs. Hence, the judge dismissed plaintiffs' claims based on "alleged omissions." Based on the same factual findings, the judge also dismissed the CFA claims.
Finally, the judge dismissed plaintiffs' negligence and strict liability claims based on the economic loss doctrine:
Both of these tort claims are barred by the economic loss doctrine ... because plaintiffs allege that the EIFS, an integrated component of their home, caused damage solely to their home itself. Where a component of an integrated product causes injury solely to the integrated product, the damage to the integrated product is not considered separate property damage that would remove the claim from the realm of contract law into the field of tort law. Such is the case here, according to the plaintiffs, who admit that they are not seeking damages for personal injury or loss of personal property other than the damage to the home itself. In addition, there is no duty emanating from the defendant [Sto] Corp., to plaintiffs Marrone for the negligence count to remain.
The court denied plaintiffs' motion for reconsideration by order dated October 5, 2007.

II
Our review of the trial court's summary judgment decision is plenary:
In deciding a motion for summary judgment, the trial court must determine whether the evidence, when viewed in a light most favorable to the non-moving party, would permit a rational fact-finder to resolve the dispute in the non-moving party's favor. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The trial court cannot decide issues of fact but must decide whether there are any such issues of fact. Ibid.; R. 4:46-2(c). Our review of a trial court's summary judgment decision is de novo, applying the Brill standard. Prudential Property Ins. v. Boylan, 307 N.J.Super. 162, 167, *334 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).
[Agurto v. Guhr, 381 N.J.Super. 519, 525, 887 A.2d 159 (App.Div.2005).]
Based on our review of the record,[3] we conclude that this case was ripe for summary judgment and that the undisputed facts entitled the Sto defendants to judgment as a matter of law.

III
Plaintiffs contend that the trial judge erred in applying the economic loss doctrine to their claims and in dismissing their claims for material omissions under the CFA.
We turn first to the CFA issue. The CFA prohibits unconscionable commercial conduct:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....
[N.J.S.A. 56:8-2.]
The CFA permits recovery by those harmed by the conduct:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.
[N.J.S.A. 56:8-19 (emphasis added).]
Our prior decision in Chattin v. Cape May Greene, Inc., 216 N.J.Super. 618, 524 A.2d 841 (App.Div.), certif. denied, 107 N.J. 148, 526 A.2d 209 (1987), is directly on point with respect to plaintiffs' CFA claim. In that case, we addressed CFA claims filed by persons who bought houses built with allegedly "insulated windows" which proved to be defective. We held that homeowners who received oral or written representations about the windows were entitled to pursue CFA claims. Id. at 641, 524 A.2d 841. However, we affirmed the dismissal of claims filed by subsequent purchasers who had no contact with the builder, CMG:
Plaintiffs' argument that subsequent purchasers of homes should have been permitted to recover consumer fraud damages, even though they never received either the brochure or any oral representation from CMG concerning the windows, is clearly lacking in merit. There is no basis for finding a violation of the Consumer Fraud Act with respect to these purchasers because CMG made no representation to them. Stated another way, these purchasers have not suffered "any ascertainable loss of moneys or property" as a result of CMG's use of a practice declared unlawful by the Consumer Fraud Act, and hence they have no claim under N.J.S.A. 56:8-19.
[Id. at 641, 524 A.2d 841 (emphasis added).]
As in Chattin, plaintiffs here did not prove that they received, much less relied *335 on, any representations from the Sto defendants. Plaintiffs' reliance on Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J.Super. 200, 543 A.2d 1020 (App.Div.1988), aff'd o.b., 118 N.J. 249, 571 A.2d 294 (1990), is misplaced. That case involved a chain of misrepresentations, explicit and implicit, concerning a yacht motor. In that context, we stated: "We therefore interpret the Consumer Fraud Act to encompass the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer." Id. at 211, 543 A.2d 1020. In this case, the evidence indicated that Sto actively marketed its EIFS cladding to builders and architects and other construction professionals. Unlike Perth Amboy Iron Works, however, there is no evidence that Sto's representations were conveyed to the DeCilveos or to plaintiffs or that they were even aware that the EIFS cladding was part of the house.
Plaintiff's reliance on Port Liberte Homeowners Association, Inc. v. Sordoni Construction Co., 393 N.J.Super. 492, 924 A.2d 592 (App.Div.), certif. denied, 192 N.J. 479, 932 A.2d 30 (2007), is likewise inapt. There we held that a condominium association had standing to assert CFA claims against Dryvit, a manufacturer of EIFS cladding, based on misrepresentations made to the original developer of the condominium complex. We premised our holding on the unique status of condominium associations and explicitly distinguished such associations from individual home buyers: "The relationship between a developer and a condominium association is unique as compared to the relationship between a developer and a single-family homeowner." Id. at 502, 924 A.2d 592. Moreover, in Port Liberte, we recognized the continued viability of Chattin, supra, and distinguished that case:
This matter is distinguishable from Chattin.... Plaintiffs are not subsequent purchasers of the condominium property. Under the legislative scheme, they occupy the same role as the developer, having stepped into the developer's shoes.... [Defendant] Dryvit was on notice that the project was a condominium, and that plaintiffs, the end-users of the EIFS, would ultimately govern the common elements upon completion of the construction. As such, any misrepresentations made to the developer were essentially made to the associations.
[Id. at 506-07, 924 A.2d 592 (citations omitted).]
Plaintiffs are correct in asserting that privity of contract is not required in a CFA claim.
[P]rivity is not a condition precedent to recovery under the New Jersey Consumer Fraud Act ... since section 19 clearly grants a remedy to "any person who suffers any ascertainable loss." There is no provision that the claimant have a direct contractual relationship with the seller of the product or service.
[Katz v. Schachter, 251 N.J.Super. 467, 474, 598 A.2d 923 (App.Div.1991), certif. denied, 130 N.J. 6, 611 A.2d 646 (1992).]
However, in this case, there is not only a lack of privity, there is a complete lack of proof of a causal connection between the Sto defendants' alleged misrepresentations about their product and plaintiffs' decision to purchase the house. See N.J.S.A. 56:8-19. In fact, both plaintiffs and their sellers believed that the house's exterior was stucco.[4] Plaintiffs' reliance on Zorba Contractors, *336 Inc. v. Housing Authority of Newark, 362 N.J.Super. 124, 827 A.2d 313 (App.Div.2003), is misplaced. In Zorba, we noted that "`consumer fraud requires... proof of a causal nexus between the concealment of the material fact and the loss.'" Id. at 139, 827 A.2d 313 (quoting Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 43, 752 A.2d 807 (App.Div. 2000)).
Further, to the extent plaintiffs assert that Sto violated the CFA through an omission rather than an affirmative misstatement, their claim fails. "To prove that ... acts of omission constituted consumer fraud, plaintiff must show that the defendant intentionally concealed the information... with the intention that plaintiff would rely on the concealment, and that the information was material to the transaction." Judge v. Blackfin Yacht Corp., 357 N.J.Super. 418, 426, 815 A.2d 537 (App.Div.), certif. denied, 176 N.J. 428, 824 A.2d 157 (2003). That proof was absent here. Plaintiffs' CFA claim was properly dismissed.

IV
We turn next to plaintiffs' PLA claims. Under the PLA, "`[p]roduct liability action' means any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C-1b(3). The PLA defines "harm" to property as "physical damage to property, other than to the product itself." N.J.S.A. 2A:58C-1b(2).
There is no dispute that plaintiffs did not negotiate for, select, or buy the EIFS cladding separately from the house. Nor did they even know that the exterior covering was EIFS, as opposed to stucco. They contend that the EIFS cladding was defective and that it allowed moisture damage to the house's sheathing and window frames. In this context, the issue is whether plaintiffs can file a PLA suit for replacement of the EIFS cladding and for damage to the house caused by a component of the house. We hold that plaintiffs cannot pursue a PLA claim for two reasons. First, we conclude that the house is the "product," and it cannot be subdivided into its component parts for purposes of supporting a PLA cause of action. Second, even if plaintiffs were deemed to have bought the EIFS cladding as a separate item, they would not be entitled to sue for the cost of removing and replacing it, because defects in the cladding constitute "damage ... to the product itself." N.J.S.A. 2A:58C-1b(2).
We begin our consideration of the issue with the Supreme Court's decision in Alloway v. General Marine Industries, L.P., 149 N.J. 620, 695 A.2d 264 (1997), adopting the economic loss doctrine. There, the purchaser and his insurer both sued "for economic loss caused by a defect in a power boat" which sank due to a defective seam in the boat's swimming platform. Id. at 623, 695 A.2d 264. Plaintiffs sought damages for the cost of repairing the boat and for loss in its value. The Court agreed with the Law Division, that "plaintiffs could not recover [in tort or strict-liability] for economic loss resulting from damage to the boat itself" but were limited to claiming damages for breach of warranty under the Uniform Commercial Code. Id. at 623, 695 A.2d 264. The Court defined economic loss as including "damages for costs of repair, replacement of defective goods, inadequate *337 value, and consequential loss of profits" as well as "`the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" Id. at 627, 695 A.2d 264 (citations omitted).
After reviewing precedent from many other jurisdictions,[5] the Court overruled its prior holding in Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965), which permitted a consumer to maintain a strict-liability claim against a manufacturer "for loss of value of a defective carpet." Alloway, supra, 149 N.J. at 625, 695 A.2d 264. The Court concluded that "the United States Supreme Court, the overwhelming majority of state courts, and legal scholars have recognized the unfairness of imposing on a seller tort liability for economic loss. Accordingly, we hold that plaintiffs' tort claims are barred." Id. at 643, 695 A.2d 264.
In reaching its conclusion, the Court reasoned that tort claims are more appropriate to accidental loss while contract claims are more appropriate to deal with claims of lost value:
Allocation of economic loss between a manufacturer and a consumer involves assessment of tort and contract principles in the determination of claims arising out of the manufacture, distribution, and sale of defective products. Generally speaking, tort principles are better suited to resolve claims for personal injuries or damage to other property. Contract principles more readily respond to claims for economic loss caused by damage to the product itself.
Various considerations support the distinction. Tort principles more adequately address the creation of an unreasonable risk of harm when a person or other property sustains accidental or unexpected injury. When, however, a product fails to fulfill a purchaser's economic expectations, contract principles, particularly as implemented by the U.C.C., provide a more appropriate analytical framework. Implicit in the distinction is the doctrine that a tort duty of care protects against the risk of accidental harm and a contractual duty preserves the satisfaction of consensual obligations.
[Id. at 627-28, 695 A.2d 264 (citations omitted).]
Further addressing the policy reasons for the distinction, the Court considered that:
Relevant to the distinction are "the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system." Perfect parity is not required for a finding of substantially equal bargaining power. Although a manufacturer may be in a better position to absorb the risk of loss from physical injury or property damage, a purchaser may be better situated to absorb the "risk of economic loss caused by the purchase of a defective product."
[Id. at 628, 695 A.2d 264 (citations omitted).]
The Court also considered that the Legislature, in enacting the U.C.C., had created warranty remedies for consumers dissatisfied with the quality of their purchases Id. at 629-30, 695 A.2d 264. The Court further *338 noted the availability of remedies under the CFA. Id. at 640, 695 A.2d 264.
The Alloway Court also gave significant consideration to the decision of the United States Supreme Court in East River Steamship Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), rejecting a tort remedy where several supertanker vessels were disabled due to defective turbines. While East River was an admiralty case, the reasoning was persuasive to our Court, which discussed East River as follows:
After analyzing relevant state court decisions, including Santor, ... the Court concluded "that a manufacturer in a commercial transaction has no duty under negligence or strict products-liability theory to prevent a product from injuring itself." Id. at 871, 106 S.Ct. at 2302, 90 L.Ed.2d 865. In an action for economic loss, the reasons for imposing a tort duty are weak while "those for leaving the party to its contractual remedies are strong." Ibid. For example, injury to a product itself neither implicates the safety concerns of tort law, ibid., nor justifies "[t]he increased cost to the public that would result from holding the manufacturer liable in tort." Id. at 872, 106 S.Ct. at 2302, 90 L.Ed.2d 865. Allowing recovery for all foreseeable damages in claims seeking purely economic loss, could subject a manufacturer to liability for vast sums arising from the expectations of parties downstream in the chain of distribution. Id. at 874, 106 S.Ct. at 2304, 90 L.Ed.2d 865.
[Alloway, supra, 149 N.J. at 632-33, 695 A.2d 264.]
While Alloway did not specifically address the PLA, or the particular fact pattern involved here, where one component of a house has allegedly damaged other portions of the house, the Court noted that a number of other jurisdictions had held that tort law could not be invoked against the manufacturer of a component that harmed the product of which it was a part. Id. at 633-35, 695 A.2d 264. In dicta, the Court also cited with approval a series of cases holding that homeowners could not sue in tort or strict liability for defective workmanship:
Other jurisdictions also have rejected homeowners' reliance on tort law to recover economic loss arising out of construction defects. See, e.g., Oceanside[ v. Peachtree Doors], supra, 659 A.2d [267] at 270 [Maine 1995] (rejecting association's and individual homeowners' tort claims that sought recovery of economic loss caused by water damage around windows); Morris v. Osmose Wood Preserving, 99 Md.App. 646, 639 A.2d 147, 152 (1994) (rejecting homeowners' tort claims against plywood manufacturer for gradual deterioration of plywood in roofs because such damage constituted economic loss), modified, 340 Md. 519, 667 A.2d 624 (1995); Lempke v. Dagenais, 130 N.H. 782, 547 A.2d 290, 291 (1988) (rejecting property owners' tort claims for economic loss resulting from defective construction of garage); Waggoner[ v. Town & Country Mobile Homes], supra, 808 P.2d [649] at 650, 653 [Okla.1990] (rejecting mobile home purchasers' tort actions against manufacturer for costs of repair and lost value resulting from defective roof design when damage was to only the mobile home itself, and holding that claim would be more properly made in warranty action). Cf. Aronsohn v. Mandara, 98 N.J. 92, 107, 484 A.2d 675 (1984) (declining "to decide the validity of plaintiff's negligence claim, since ... the contractor's negligence would constitute a breach of the contractor's implied promise to construct the patio in a workmanlike manner").
[Id. at 638, 695 A.2d 264.]
*339 Alloway did not "resolve the issue whether tort or contract law applies to a product that poses a risk of causing personal injuries or property damage but has caused only economic loss to the product itself." Id. at 639, 695 A.2d 264.
Following Alloway, in Goldson v. Carver Boat Corp., 309 N.J.Super. 384, 707 A.2d 193 (App.Div.1998), we addressed the issue of damage to property caused by a defect in a component. As did the Court, we adopted the rationale of East River, supra:
In East River Steamship Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the United States Supreme Court held that, as a matter of federal admiralty law, damage solely to a defective product was not actionable in tort. Id. at 871, 106 S.Ct. at 2302, 90 L.Ed.2d at 877. The Court considered but rejected decisions that adopted intermediate positions, which permitted tort recovery when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself. Id. at 868-70, 106 S.Ct. at 2301-02, 90 L.Ed.2d at 875-76. The Court stated:
The intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior.... Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain-traditionally the core concern of contract law.
[Goldson, supra, 309 N.J.Super. at 393-94, 707 A.2d 193 (quoting East River, supra, 476 U.S. at 870, 106 S.Ct. at 2301-02, 90 L.Ed.2d at 876 (citations omitted)).]
Adopting this rationale, in Goldson, we affirmed the dismissal of product liability and negligence claims against the seller of a luxury yacht and against a company that installed the yacht's engine. We concluded:
Product liability grew out of a public policy judgment that people need more protection from dangerous products than may be afforded by the law of contracts and warranties. "The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality." But other concerns exist where the buyer has "no real freedom of choice" and the manufacturer uses its "grossly disproportionate bargaining power" to introduce into the stream of commerce an instrumentality that, because of its defective design or construction, poses a "grave danger of injury" to other persons or property. Thus, the "paradigmatic products-liability action is one where a product `reasonably certain to place life and limb in peril,' distributed without reinspection, causes bodily injury" or property damage to others. However, "if this development were allowed to progress too far, contract law would drown in a sea of tort."
Where, as here, there is no substantial disparity in bargaining power, and the only damage caused by the defective product is to the product itself, contract law, and the law of warranty in particular, is best suited to set the metes and bounds of appropriate remedies.... Tort principles are thus suited for resolving claims involving "unanticipated physical injury." On the other hand, a contractual duty arises from society's *340 interest in the performance of promises. Contract principles are thus appropriate for determining "claims for consequential damage that the parties have, or could have, addressed in their agreement."
[Id. at 396-98, 707 A.2d 193 (citations omitted).]
In a subsequent case, closely on point here, we briefly addressed product liability, negligence, and strict liability claims concerning defective plywood used as a component in modernizing the roofs at a public housing complex. The plywood turned out to be insufficiently fire-proof to meet building code requirements, and as a result, all of the roofs had to be replaced by the complex's owner, the Newark Housing Authority (NHA). Zorba, supra, 362 N.J.Super. at 128, 827 A.2d 313. Citing Goldson and Alloway, we affirmed dismissal of NHA's claims against the plywood manufacturer as well as against the entity that applied fire retardant to the plywood and the manufacturer of the fire retardant. Id. at 142, 827 A.2d 313. See also King v. Hilton-Davis, 855 F.2d 1047, 1050-51 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989).
In Easling v. Glen-Gery Corp., 804 F.Supp. 585, 590-91 (D.N.J.1992), the court rejected an apartment complex purchaser's PLA claim for damage due to defective brick facing, reasoning that:
The question thus becomes what "product" the plaintiffs purchased for the purposes of resolving the instant motion. The plaintiffs purchased a completed apartment complex. They did not purchase a load of bricks from the defendant. The Third Circuit has held that in determining whether a product has injured only itself in a products liability action in which a component part manufactured by a defendant causes injury to the product of which it is a part, the court must look not to the product manufactured by the defendant, but to the product purchased by the plaintiff. King v. Hilton-Davis, 855 F.2d 1047, 1051 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989). Thus, even if the court assumes that plaintiff can prove that the allegedly leaking walls have led to damage to the studs or interiors of the building, the plaintiffs can not prove that the product that they purchased is anything other than the apartment complex itself, and the Products Liability Act thus fails to provide them with a basis for seeking tort relief.
[Id. at 590-91.]
We find the reasoning of Easling persuasive and consistent with Alloway, Goldson, and East River. Plaintiffs here did not purchase the EIFS cladding; they bought a house. They cannot maintain a PLA claim by attempting to break the house down conceptually into its component parts and suing in strict-liability for defects in the components. As in Alloway, we acknowledge that the Legislature has created statutory remedies for consumers, in this case dissatisfied homeowners, by adopting the New Home Warranty and Builders' Registration Act, N.J.S.A. 46:3B-1 to -20, as well as the CFA. Moreover, as East River recognized, allowing a tort remedy here would subject component manufacturers to potentially unlimited liability. Under plaintiffs' theory, a buyer who purchased plaintiffs' house fifty years from now and discovered defects in the EIFS cladding could potentially sue the Sto defendants for water damage to the house.
DiIorio v. Structural Stone & Brick Co., 368 N.J.Super. 134, 845 A.2d 658 (App.Div. 2004), on which plaintiffs rely, is distinguishable, because we approached the case *341 as presenting an issue of builder malpractice rather than an issue of defective goods. Unlike the case before us, in DiIorio, the plaintiff contracted directly with a builder to construct a house for him. In the course of planning the construction, at the builder's suggestion DiIorio consulted with the builder's supplier, Structural Stone & Brick, concerning the type of stone facing plaintiff might want installed on the house. Based on that consultation, DiIorio authorized the builder to use stone facing supplied by Structural Stone. When the stone eventually proved to be defective, causing damage to the house, DiIorio first sued the builder and later sued Structural Stone. The issue, as we framed it, was whether DiIorio's claims "for economic losses arising out of the deterioration of the stone façade ... are governed by the four year statute of limitations of the Uniform Commercial Code... or by the six year statute of limitations applicable to tortious injury to real or personal property." Id. at 136, 845 A.2d 658 (citations omitted).
In concluding that the claims were governed by the six-year limitations period, we reasoned that "the transaction was primarily one for the professional services of a builder in which Structural Stone supplied stone incidental to the contract for the construction." Id. at 137, 845 A.2d 658. We also reasoned that the U.C.C. did not apply "to transactions in real property." Id. at 141, 845 A.2d 658. We concluded, at least for purposes of Structural Stone's summary judgment motion, that plaintiff was suing over a "transaction in real property or, alternatively, a transaction for the rendition of services, namely the construction of residential premises which incidentally included the provision of certain goods." Id. at 141, 845 A.2d 658. DiIorio is not on point, because plaintiffs here did not obtain the professional services of either the builder or the Sto defendants and could not sue any of those parties for professional negligence.[6]
Consequently, we hold that plaintiffs cannot maintain a PLA claim against the Sto defendants for defects in the EIFS cladding itself or for water damage to the house allegedly caused by those defects.
Affirmed.
NOTES
[1] Plaintiffs initially sued G & P and its principals, and Lester Stucco, but it settled with those parties, leaving only plaintiffs' claims against Sto and Sto of NJ (the Sto defendants).
[2] Contrary to plaintiffs' claims, Buric did not find that the EIFS caused damage to "landscaping." Rather they recommended that the EIFS cladding be removed and replaced, and they projected that landscaping could be damaged in the course of replacing the cladding. Buric did not note any water damage to the exterior deck, and at her deposition, Mrs. Marrone indicated that plaintiffs had no problems with the deck other than its "beat up" appearance. She admitted plaintiffs were not making any claims for damage to personal property or for personal injury.
[3] We required the parties to provide us with the statements and counterstatements of undisputed material facts filed with the summary judgment motions. See R. 4:46-2.
[4] In that respect, Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350 (1997), is not on point. In that case, the realtor allegedly made misrepresentations to the home buyers about the excellent qualifications of the builder. The homes later proved to have multiple serious defects.
[5] See, e.g., Nat'l Union Fire Ins. Co. v. Pratt & Whitney Canada, Inc., 107 Nev. 535, 815 P.2d 601, 603-05 (1991), which the Court described as "holding that economic loss [is] not recoverable from [an] engine manufacturer under tort theories of negligence and strict liability even though [the] defective engine damaged [the] entire aircraft and [the] product caused [a] calamitous crash." Alloway, supra, 149 N.J. at 635, 695 A.2d 264.
[6] In DiIorio, we also concluded that plaintiff's CFA claim properly survived summary judgment. DiIorio consulted with the builder and stone supplier, who, according to his proofs, "knew the intended use" of the stone facing, and knew it was unfit for the intended use, "but nevertheless failed to disclose that knowledge to" the plaintiff. Id. at 142-43, 845 A.2d 658. DiIorio also claimed that Structural Stone misrepresented the seriousness of the defects in the stone when he brought problems to its attention. Unlike DiIorio, plaintiffs here did not receive or rely on any representations from the Sto defendants.