**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2128-15T4

DOUGLAS MARTIN and
KIMBERLY MARTIN, his wife,

    Plaintiffs-Appellants/
    Cross-Respondents,

v.

BANK OF AMERICA,

    Defendant-Respondent/
    Cross-Appellant,

and

MGCC GROUP OF COMPANIES, M.G.C.C. GROUP,
INC.; C.G.I. DEVELOPMENT CO., INC.;
CONSTRUCTION MANAGEMENT CO., INC.; M.G.
INVESTMENT GROUP, INC., CGIMG GROUP, LLC,
JOHN TEDESCO, Member and as an Individual
Owner of CGIMG GROUP, LLC; M.G.T. GROUP,
INC., WILLIAM A. GREENBERG, IRWIN M.
NUDELMAN, and ARTHUR J. GALLY,
Individually, and as Officers, Directors
of Principals of M.G.C.C. GROUP OF
COMPANIES, M.G.C.C. GROUP, INC.,
CRYSTAL CREEK REALTY, INC., C.G.I.
DEVELOPMENT CO., INC., C.G.I. CONSTRUCTION
MANAGEMENT CO., INC., well as ARTHUR
J. GALLY, President of M.G.C.C. GROUP OF
COMPANIES, M.G.C.C. GROUP, INC. and CRYSTAL
CREEK REALTY, INC., ABBINGTON ASSOICIATES,
INC., JAMES P. KOVACS, P.E., L.S.,
Individually and as Principal of
ABBINGTON ASSOCIATES, INC., JAMES R.

IENTILE, INC., JAMES R. IENTILE,
Individually, and as Principal of
JAMES R. IENTILE, INC.; CHARLES E.
LINDSTROM, Individually, ANDERSON
BALLIS & LINDSTROM ASSOCIATES, INC.,
LINDSTROM & DIESSNER ASSOCIATES, PC
CONDO/HOUSE MART INC., HOUSE MART,
INC., SUSAN SMITH and DEBRA BURAGINA,

     Defendants,

and

M.G.C.C. GROUP, INC., WILLIAM A.
GREENBERG, IRWIN M. NUDELMAN,
ARTHUR J. GALLY, C.G.I. DEVELOPMENT
CO., INC., C.G.I. CONSTRUCTION MANAGEMENT
CO., INC., M.G. INVESTMENT GROUP, INC.,
JOHN J. TEDESCO, M.G.T. GROUP, INC.,
and CRYSTAL CREEK REALTY INC.,
Individually,

     Third-Party Plaintiffs,

v.

TOWNSHIP OF HOWELL,

     Third-Party Defendant.

_____

Submitted May 14, 2018 — Decided July 30, 2018

Before Judges Sabatino, Rose and Firko.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Docket No. L-
4030-08.

Shackleton & Hazeltine, attorneys for
appellants/cross-respondents (Richard J.
Shackleton and Brian J. Coyle, on the briefs).

A-2128-15T4

Meyner and Landis, LLP, attorneys for respondent/cross-appellant (Scott T. McCleary and Matthew P. Dolan, on the briefs).

PER CURIAM

This appeal and cross-appeal have their genesis in misrepresentations and omissions by defendant Bank of America's ("BOA") predecessor to the Howell Township Planning Board ("Board"), regarding the third phase of residential development ("section III") of Crystal Creek Estates ("CCE"). Plaintiffs Douglas and Kimberly Martin purchased a home in CCE's second phase of development ("section II"), and thereafter sought recovery for property damages from flooding caused by the construction of section III. They filed claims against BOA and many others,[1] pursuant to the Consumer Fraud Act, N.J.S.A. 56:8-1 to -195 ("CFA"), and under common law theories of trespass and nuisance.

Following a six-week jury trial and verdict in their favor, plaintiffs appeal from certain portions of the December 21, 2015

---

[1] In their second amended complaint, plaintiffs also named as defendants: M.G.C.C. Group, Inc., C.G.I. Development Co., Inc., Construction Management Co., Inc., Crystal Creek Realty Inc., and their representatives (collectively, "M.G.C.C."). The M.G.C.C. named the Township of Howell as a third-party defendant. Prior to trial, plaintiffs' claims against the other individuals and entities were dismissed with prejudice, either voluntarily or by way of summary judgment. None of the other defendants is a party to this appeal.

final judgment, claiming the judge erred as a matter of law by: (1) determining the appropriate measure of damages on the CFA and trespass claims was the diminution in the market value of their property, and by limiting those damages to the value assessed by BOA's expert; (2) reducing their counsel fees and failing to award prejudgment interest on the fee award;[2] (3) permitting the jury to allocate comparative negligence, thereby reducing the CFA award by thirty-five percent; and (4) denying their July 21, 2015 motion for leave to file a third amended complaint alleging legal abatement so as to conform to the jury's verdict. BOA cross-appeals, contending the trial judge erred in denying its applications to dismiss plaintiffs' CFA claim before and during trial, and the judge's award of fees should have been reduced further because plaintiffs were only nominally successful in obtaining monetary relief.[3]

For the reasons that follow, we reverse the judgment entered in favor of plaintiffs on their CFA claim and counsel fee award,

---

[2] Plaintiffs also appeal from the January 8, 2016 final order awarding fees and costs on the same basis.

[3] In addition to appealing from the December 21, 2015 final judgment and January 8, 2016 order, BOA appeals from a December 1, 2010 order denying its motion to dismiss the CFA claim, a December 27, 2012 order denying summary judgment, and a September 18, 2013 order granting plaintiffs' motion for reconsideration of an April 22, 2013 order dismissing their CFA claim.

thereby rendering moot the appeal and cross-appeal concerning the adequacy of fees. We affirm that portion of the judgment regarding the trial court's legal determination on the appropriate measure of damages for plaintiffs' trespass claim, but vacate the court's monetary calculation and remand the assessment of trespass damages for a jury determination. Further, we affirm the trial court's denial of plaintiffs' application to file a third amended complaint, and the court's decision that principles of mitigation of damages apply to the entire verdict.

## I.

## A.

Initially, we consider the trial court's judgment denying BOA's motion for involuntary dismissal at the close of plaintiffs' case, Rule 4:37-2, and judgment at the close of all evidence, Rule 4:40-1. In doing so, we discern the pertinent facts and procedural history from the trial record, extending to plaintiffs all favorable inferences. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016).[4]

---

[4] Plaintiffs would be entitled to comparable inferences in our review of BOA's summary judgment motions. R. 4:46; Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995). Because we dispose of plaintiffs' CFA claims pursuant to BOA's applications made during trial, we need not reach BOA's pre-trial applications.

At trial, plaintiffs presented evidence that BOA's predecessor, Fleet Bank NA ("Fleet"),[5] concealed engineering plans and made misrepresentations to the Board in order to obtain final approvals for section III, which Fleet needed to complete the sale to co-defendant developer, M.G.C.C. Plaintiffs claimed the concealed plans indicated that six lots in section II, including their lot, needed regrading to prevent infiltration by surface and groundwater runoff from section III. Plaintiffs, who had no direct contact with BOA, argued if Fleet had disclosed the plans, the Township would not have approved section III, the developer would not have purchased the real estate, and in turn their property would not have flooded.

CCE's subdivision was designed by co-defendant Charles Lindstrom, the project engineer. Following the Board's approval of the plan, the Department of Environmental Protection adopted regulations, which required stormwater management planning for major developments, and mandated installation of detention basins to reduce flooding and minimize runoff. To effectuate a properly functioning drainage system, Lindstrom revised the engineering

---

[5] First Jersey National Bank acquired title by deed in lieu of foreclosure to land for the development of section III. That bank was acquired by National Westminster Bank NJ, which became known as NatWest Bank NA ("NatWest"), which was acquired by Fleet, which was then acquired by BOA.

plan to regrade the rear yards of lots 2-6 in section II so that they would be level with those of section III.

Although the Board granted site plan approval for section III in April 1990, work on the project could not commence until several of its conditions were satisfied. Those conditions included redesign of the stormwater or detention basin "to meet current ordinance requirements as to slopes, depth, lot size, etc." In the meantime, BOA's predecessor, NatWest, contracted to sell section III to an individual, who later assigned the contract to M.G.C.C. The contract required NatWest to meet the Board's conditions for approval and to convey thirty-one buildable lots.

By July 1996, NatWest had been acquired by Fleet, whose attorney and Lindstrom appeared before the Board. Among other things, they indicated NatWest was then or formerly the owner of lots 2-6 in section II, and failed to present an engineering map depicting the proposed and required regrading of those lots. Based on the presentation by Lindstrom and Fleet's counsel, the Board approved section III in August 1996.

In April 2002, Fleet conveyed title of section III to M.G.C.C. Fleet did not present to M.G.C.C. the engineering map that depicted the regrading of lots 2-6 in section II. M.G.C.C. then commenced construction according to the revised approved engineering plans. When installing the drainage pipes along the south side of Alexis

7

Drive where sections II and III meet, M.G.C.C. discovered the discrepancy between the revised plans and the actual field conditions. Specifically, the existing grade of the rear yards of lots 2-6 in section II was two to three feet below the grade of section III, causing the trapping of water in the rear yards of lots 2-6.

Plaintiffs' home is located on Alexis Drive, and designated as block 184.02, lot 6 on the Township's tax map. The house was constructed in 1995 by their predecessors in title, Steven and Linda Lefker. In late 2002, the Lefkers experienced surface water flooding on their property, and dampness and water in the sump pump well in their basement. They filed suit against M.G.C.C.[6] and the Township, seeking to enjoin further construction of section III until the plans were redesigned to provide that the homes in that section would be built at the same elevation as those in section II.

During the course of litigation, the Lefkers retained Bernard Berson, a civil engineer. Among other things, Berson opined that: a discrepancy in the grading elevations was causing the flooding; changes in the water level of the detention basin might affect

---

[6] M.G.C.C. filed a third-party complaint against Fleet.

groundwater elevations on the property; and continued construction of section III would cause more harm to the property.

In October 2003, the Lefkers settled their claims. According to the settlement agreement, M.G.C.C. agreed to repurchase the property for $453,000, pay certain legal fees, and fund a remediation plan. Fleet contributed toward those costs, but the Lefkers did not release any claims against the bank.

Pursuant to the remediation plan, M.G.C.C. constructed a retaining wall to resolve the grade differential and a concrete swale to carry surface water to a drainage inlet, alleviating water infiltration. By correspondence dated March 23, 2004, an authorized representative of M.G.C.C. informed its listing realtors that it was "important" they advise "any potential purchasers of [XX] Alexis Drive" about the litigation, the engineering determination that several homes in section II, including that home, were constructed below the grade proposed for section III, and "it is likely that remedial work that will benefit [XX] Alexis Drive and the neighboring properties will be undertaken and completed in the future."

In July 2004, M.G.C.C. sold the property to Brian and Dawn Veprek. The following year, the Vepreks sold the property to plaintiffs. During their one year of ownership, the Vepreks did

not experience any issues with flooding or water intrusion in the basement.

Plaintiffs obtained a home inspection report before purchasing the property. The report indicated the basement was dry, and there was insufficient water in the sump pump pit to test it. Nonetheless, the inspector recommended plaintiffs regrade the land from the house to reduce possible moisture intrusion into the basement. Because "[o]ngoing site preparation for another housing development at the rear of the property [might] also have an effect on the drainage of [plaintiffs'] property[,]" the inspector recommended "it would be prudent to contact the local government to review the site plans and particularly the discussion on the effect to adjoining areas such as this property."

Plaintiffs claimed the home inspection did not alert them to any potential problems with flooding in the yard or the basement. Although the retaining wall and concrete swale had been constructed behind the house, and a sump pump and French drain were installed in the basement when they purchased the home, plaintiffs were not aware of any flooding or water intrusion problems at that time.

Approximately four months after plaintiffs moved in, M.G.C.C. continued to dump fill behind plaintiffs' home to raise the elevation of the abutting section III lots. Plaintiffs claimed they experienced some backyard and basement flooding during their

first year of ownership. Two years after they moved in, however, plaintiffs installed an in-ground swimming pool and a patio in their backyard.

As the construction of section III progressed, plaintiffs testified that the water intrusion became increasingly worse, causing water to stream into their basement through the walls and up from the French drains. Snakes were found in the basement, along with a "little spout of water" squirting from the wall, interfering with their use of their basement. The flooding did not interfere, however, with use of their backyard, pool or patio.

Plaintiffs admitted they had not taken measures to remediate the water damage. They did not regrade the property, as recommended by their home inspection report; hire an exterminator to determine the snakes' origin; or waterproof the basement.

The jury returned a verdict in favor of plaintiffs against BOA on the CFA, trespass, and nuisance claims. The judge set the amount of damages on the CFA and trespass claims at $25,000, based on the unrebutted expert testimony of defense real estate appraiser, Mohammad Imran. The jury awarded $2500 on the nuisance claim, pertaining to the water infiltration in the basement of plaintiffs' home. The jury also determined plaintiffs were thirty-five percent at fault for "fail[ing] to exercise reasonable care to address the water intrusion." After molding the damage awards

accordingly, the judge issued a final judgment against BOA, awarding plaintiffs treble damages of $48,750 on their CFA claim, $1625 on the nuisance and trespass claims, and $1,817,937 in counsel fees and expenses as prevailing parties under the CFA.[7] This appeal followed.

B.

A party is authorized by Rule 4:40-1 to move for judgment at the close of all evidence. A trial judge considering such a motion must apply this "evidential standard: 'if, accepting as true all the evidence which supports the position of the party defending against the motion and according [such party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied[.]'" Smith, 225 N.J. at 397 (second alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (citation omitted)). We apply the same governing standard when we review a trial judge's decision on a motion for a directed verdict. Frugis v. Bracigliano, 177 N.J. 250, 269 (2003). However, we review

---

[7] The judge offset the damages award by thirty-five percent, representing plaintiffs' allocated share of fault. The judge also awarded pre-judgment interest in the amount of $3,841 on the CFA claim and $153 on the nuisance and trespass claims. Pursuant to the January 8, 2016 order, the judge awarded an additional $15,720 in counsel fees and $1,631 in costs, but denied plaintiffs' application for pre-judgment interest on their fees.

issues of law de novo, according no deference to the trial judge's conclusions on issues of law. Perez v. Professionally Green, LLC, 215 N.J. 388, 399 (2013) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)); Zabilowicz v. Kelsey, 200 N.J. 507, 512-13 (2009).

As amended in 1971, the CFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011). "It was enacted 'to combat "sharp practices and dealings" that victimized consumers by luring them into purchases through fraudulent or deceptive means.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 121 (2014) (quoting Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994)). The CFA prescribes a cause of action on behalf of "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ." N.J.S.A. 56:8-19.

A CFA claim brought by a consumer "requires proof of three elements: '(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.'" Manahawkin, 217 N.J. at 121 (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)). "A plaintiff who proves all three elements may be

awarded treble damages, 'attorneys' fees, filing fees and reasonable costs of suit.'" Ibid. (quoting N.J.S.A. 56:8-19).

Pursuant to N.J.S.A. 56:8-2, an "unlawful practice" includes:

> any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

"An 'unlawful practice' contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation." Dugan v. TGI Fridays, Inc., 231 N.J. 24, 51 (2017) (citation omitted).

Here, there was sufficient evidence to support the jury's verdict as to the first CFA element. For example, BOA's predecessor committed unlawful acts in misrepresenting to the Board its ownership of lots 2-6 in section II, and in omitting, with the intent to deceive M.G.C.C., an engineering map depicting "the proposed and required regrading of [s]ection II, lots 2 through 6."

The crux of BOA's argument concerning the CFA, however, is the lack of a causal connection between the unlawful conduct

surrounding the conveyance of section III and plaintiffs' purchase of their home in section II. In contrast to common law fraud, the causation element of N.J.S.A. 56:8-19 is not "the equivalent of reliance." Dugan, 231 N.J. at 53 (quoting Lee v. Carter-Reed Co., 203 N.J. 496, 522 (2010)). Instead, in a private action, "the CFA requires a showing of 'a causal relationship between the unlawful conduct and the ascertainable loss.'" Ibid. (quoting Bosland, 197 N.J. at 557). The statutory phrase "as a result of" connotes a "causal nexus requirement." Bosland, 197 N.J. at 557-58 (quoting N.J.S.A. 56:8-19). However, contractual privity is not required to bring a CFA claim. Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co., 226 N.J. Super. 200, 210-11 (App. Div. 1988).

Our courts "have generally found causation to be established for CFA purposes when a plaintiff has demonstrated a direct correlation between the unlawful practice and the loss; they have rejected proofs of causation that were speculative or attenuated." Heyert v. Taddese, 431 N.J. Super. 388, 421 (App. Div. 2013). A "complete lack" of any relationship between the defendant's unlawful conduct and the plaintiff's loss compels a finding of a lack of causation under the CFA. Marrone v. Greer & Polman Constr., Inc., 405 N.J. Super. 288, 296 (App. Div. 2009); see also Sullivan, N.J. Consumer Fraud, § 11:2-2 (2018).

In cases in which the alleged misrepresentation was made to a prior purchaser and not to a plaintiff asserting the CFA claim, we have held there was a fatal lack of proof of a causal connection between the misrepresentation and the alleged loss.  See Dean v. Barrett Homes, Inc., 406 N.J. Super. 453, 462 (App. Div. 2009); Marrone, 405 N.J. Super. at 295-297; O'Loughlin v. Nat'l Cmty. Bank, 338 N.J. Super. 592, 606-07 (App. Div. 2001); Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618, 641 (App. Div. 1987).

For example, in Chattin, a group of homeowners instituted a class action suit against the builder for damages allegedly caused by defective windows.  Chattin, 216 N.J. Super. at 622.  The trial court dismissed the claims filed by subsequent home purchasers, holding only the plaintiffs who had had direct contact with the builder could recover under the CFA.  Id. at 624.  We affirmed, finding:

> Plaintiffs' argument that subsequent purchasers of homes should have been permitted to recover consumer fraud damages, even though they never received either the brochure or any oral representation from [the builder] concerning the windows, is clearly lacking in merit.  There is no basis for finding a violation of the [CFA] with respect to these purchasers because [the builder] made no representation to them.  Stated another way, these purchasers have not suffered "any ascertainable loss of moneys or property" as a result of [the builder's] use of a practice declared unlawful by the [CFA], and hence they have no claim under N.J.S.A. 56:8-19.

16

[<u>Id.</u> at 641.]

Similarly, in <u>O'Loughlin v. National Community Bank</u>, 338 N.J. Super. 592, 606-07 (App. Div. 2001), we discerned no basis for a CFA claim where the defendant bank, which, like BOA here, had acquired title by deed in lieu of foreclosure to unsold units, but had not sold the condominium units to the plaintiffs, or made promises to the plaintiffs that were connected to the sale of the units. The record also did not reveal "any specific conduct in violation of the [CFA] on the part of the Bank associated with plaintiffs' individual units, occurring subsequent to the time the Bank obtained title." <u>Id.</u> at 606.

Further, we relied on <u>Chattin</u> in deciding <u>Marrone</u>. In <u>Marrone</u>, the plaintiffs asserted CFA claims against the manufacturer and distributor of defective exterior siding, which was used to build their home, eight years before they purchased it. <u>Marrone</u>, 405 N.J. Super. at 291. The original owners were unaware that the siding was defective and had not experienced any problems with it. <u>Id.</u> at 295. After the plaintiffs bought the home, they discovered both the siding was defective and that it was improperly installed. <u>Id.</u> at 292. We affirmed the dismissal of the CFA claims because there was "a complete lack of proof of a causal connection between the . . . defendants' alleged

17 <span style="float:right">A-2128-15T4</span>

misrepresentations about their product and plaintiffs' decision to purchase the house."  Id. at 296.

Thereafter, in Dean, we adopted our reasoning in Marrone, affirming the dismissal of CFA claims where a subsequent owner sued the same manufacturer of defective siding.  Dean, 406 N.J Super. at 462.  The court found that the plaintiffs "neither received nor relied on any misrepresentation" by the defendants, and that there was "no nexus between plaintiffs' purchase of the house and [the defendants'] conduct or lack thereof."  Ibid.

In the present case, as in Chattin, O'Loughlin, Marrone, and Dean, BOA had no contact with plaintiffs, and did not make any misrepresentations or omissions to them.  Rather, the proofs adduced at trial established that BOA's predecessor made misrepresentations and omissions in order to gain site plan approval for section III, and to sell the real estate to M.G.C.C., which did not construct plaintiffs' home in section II nor sell the property to them.

Indeed, plaintiffs' alleged connection with BOA is even more tenuous than that of the plaintiffs in Dean, Marrone, O'Loughlin, and Chattin.  Plaintiffs' causal theory that if the Township had not granted the approval, M.G.C.C. would not have purchased the property, section III would not have been built, and their property in section II would not have flooded, is speculative and

attenuated. In particular, there is no proof that if M.G.C.C. declined to purchase the property, that section III, for which the Board had already granted conditional approval, and had been remediated pursuant to the Lefkers' settlement agreement, would not have been built by another developer.

Further, we are not persuaded by plaintiffs' reliance on Matera v. M.G.C.C. Group, Inc., 402 N.J. Super. 30 (Law Div. 2007). There, the Matera court reinstated[8] the CFA claims of adjoining property owners in section II who, like plaintiffs here, purchased their properties from individual owners and not from BOA. Id. at 42. Those CFA claims were grounded in the same misrepresentations and omissions made by BOA's predecessor to the Board in July 1996. Id. at 34-35. Citing Gennari v. Weichert Company Realtors, 148 N.J. 582 (1997), the Matera court found significant that "the Court stated a violator of the [CFA] is liable for any misrepresentations whether 'any person has in fact been misled, deceived, or damaged thereby . . . it did not say any party.'" Id. at 41. The Matera court then determined BOA's alleged misrepresentations to the Board and M.G.C.C. damaged the plaintiffs, holding "that although some nexus is necessary to

---

[8] The Law Division judge reinstated the claims following plaintiffs' motion for reconsideration of his earlier order, dismissing the CFA claims on summary judgment.

establish a claim under the [CFA], that nexus need only be between the alleged unlawful conduct and the ascertainable loss; it requires no contact between the parties." Ibid.

The Matera court's reasoning is not binding on us, nor do we find it persuasive. Initially, the Gennari Court did not emphasize the distinction between "any person" and "any party." Further in Gennari, the misrepresentations at issue were statements by the defendant realtor to plaintiffs concerning the builder's qualifications and experience. Gennari, 148 N.J. at 589-90. We note here, as we did in Marrone, Gennari "is not on point." Marrone, 405 N.J. Super. at 296, n.4. Rather, as we found in Marrone, "in this case, there is not only a lack of privity, there is a complete lack of proof of a causal connection between [BOA's] alleged misrepresentations . . . and plaintiffs' decision to purchase the house." Id. at 296.

Consistent with our prior holdings, we are satisfied the undisputed facts adduced at trial demonstrate a lack of causation that was fatal to plaintiffs' CFA claim as a matter of law. We, therefore, vacate the December 21, 2015 final judgment in so far as it awarded damages and attorney's fees on plaintiffs' CFA claims, and the trial court's January 8, 2016 order awarding counsel fees.

We next consider plaintiffs' argument that the court erred in determining the proper measure of damages to their property as the diminution in its market value, and not the cost of restoration.[9]  Although we have vacated that portion of the judgment awarding damages for plaintiffs' CFA claim, the court's legal determination concerning the measure of damages is also applicable to plaintiffs' trespass claim.  In setting forth the facts from the record pertaining to that motion, plaintiffs are not entitled to the same benefit of favorable inferences as the CFA claim dismissed pursuant to Rule 4:37-2 and Rule 4:40-1.

Initially, we note the December 21, 2015 final judgment appears to be at odds with the jury charge and verdict sheet.  In particular, the judgment indicates the jury awarded $25,000 for plaintiffs' CFA claims, and $2500 for plaintiffs' combined trespass and nuisance claims.  However, the trial court instructed the jury that if they "find in favor of plaintiffs on their [CFA] claims, [and] trespass claim . . . the [c]ourt's legal rulings

---

[9]  Following plaintiffs' pretrial motion to bar Imran from testifying about the diminution in value, the parties agreed that evidence of both damages theories would be presented to the jury, and, at the close of the evidence, the judge would decide the appropriate measure of damages as a matter of law.

have already addressed the measure of damages to which plaintiffs are entitled and . . . you will not have to calculate those damages." (Emphasis added).

Further, the verdict sheet contains two separate questions for the jury to consider regarding plaintiffs' nuisance claims, i.e., "damages for annoyance, inconvenience, or discomfort." One question addresses plaintiffs' nuisance claims for damage to the basement, for which the jury awarded $2500. The other question pertains to plaintiffs' nuisance claims for damage to the backyard. The jury did not award any damages for that claim. Thus, it appears that the $25,000 judgment includes the trial court's determination of damages for both the CFA and trespass claims, and the $2500 award pertains solely to plaintiffs' nuisance claim regarding the basement.

Pertinent to the judge's determination, plaintiffs presented evidence that restoration costs, including raising the grade of the house, pool, deck, patio and grounds three feet to the level of the abutting section III properties, totaled approximately $750,000. They presented no evidence as to the diminution in value or the cost of waterproofing the basement.

Conversely, BOA adduced proof that the diminution in value of the property totaled $25,000, representing $475,000 for the value of house without water infiltration, less $450,000 for the

value of house as adjusted by what appeared to be a one-time water infiltration. BOA also presented evidence that it would cost $28,000 to completely waterproof the basement.

At the close of all evidence the judge issued a lengthy oral opinion, observing:

> the [restoration] costs put forth by plaintiffs are not reasonable. This is not a unique bit of property. [Plaintiffs] have said that they simply want to live in Howell Township because of the school system. They [have] not identified anything unique about this particular property such that it would not constitute unreasonable economic waste to invest $750,000 into a house that is apparently worth $450,000.
>
> Considering as I must the overall limitation of reasonableness, the [c]ourt finds that diminution in value better reflects the plaintiffs' actual loss, rather than the restoration costs.

In so ruling, the judge found that plaintiffs were seeking more than restoration costs, i.e., "a change in the topography of their property. They're asking that soil be added to the property that wasn't there. They're asking that the house be put in a position it never was in before. They're asking for new vegetation . . . ." Further, "They are asking for a very different house than the one that the[y] purchased."

B.

"[W]e review de novo the trial court's legal determination as to the appropriate measure of damages" for plaintiffs' common law claims. Mosteller v. Naiman, 416 N.J. Super. 632, 637 (App. Div. 2010) (citing Manalapan Realty, 140 N.J. at 378). "The appropriate measure of damages for injury done to land is a complex subject and courts have responded to such claims in a great variety of ways depending upon the evidence in the particular case." Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 64 (App. Div. 1997) (citing Daniel B. Dobbs, Remedies, §§ 5.2-5.16 at 310-34 (1973)).

"In almost every case [concerning damages to real property], one of two measures is employed." Mosteller, 416 N.J. Super. at 638. Both measures have "a wide sphere of application, and the court's selection of one test or the other is basically an assessment of which is more likely to afford full and reasonable compensation." Ibid. (quoting Velop, 301 N.J. Super. at 64).

The first measure, described as the "most commonly mentioned in the opinions," is diminution of value. Velop, 301 N.J. Super. at 64 (citation omitted). "Under this measure the plaintiff is entitled to recover the difference in the value of his property immediately before and immediately after the injury to it, that [is], the amount his property has diminished in value as a result of the injury." Ibid.

The diminution-of-market-value measure of damages is generally applicable in cases in which the harm to land is permanent. Woodsum v. Pemberton, 177 N.J. Super. 639, 646 (App. Div. 1981); see also 8 Thompson on Real Property, Third Thomas Edition, § 67.06(a)(2) at 157 (David A. Thomas ed. 2016) (permanent damages for harm to property are measured by depreciation in market value of the property). This measure has been applied in similar cases involving damage caused by excessive excavation on an adjoining lot, McGuire v. Grant, 25 N.J.L. 356, 368 (1856) (measure of damages "is not what it will cost to restore the lot to its former situation, or to build a wall to support it, but what is the lot diminished in value by reason of the acts of the defendant"), and involving damage caused by the overflow of water resulting from the negligent maintenance of drainage pipes and ditches, Kita v. Borough of Lindenwold, 305 N.J. Super. 43, 51 (App. Div. 1997).

The second measure, "the replacement-cost or restoration-cost measure[,] . . . 'awards the plaintiff the reasonable cost of restoring or repairing the damage.'" Mosteller, 416 N.J. Super. at 638 (quoting Velop, 301 N.J. Super. at 64). This measure is generally applied where the damage is temporary. Woodsum, 177 N.J. Super. at 646. For example, restoration-cost was applied in a faulty construction case involving damage from the defective

installation of glass panels. St. Louis, LLC v. Final Touch Glass & Mirror, Inc., 386 N.J. Super. 177, 194 (App. Div. 2006).

Further, the Restatement (Second) of Torts section 929 (Am. Law Inst. 1979), as cited and generally accepted by our courts, see Ayers v. Jackson, 106 N.J. 557, 571 (1987), and Siligato v. State, 268 N.J. Super. 21, 31 (App. Div. 1993), affords a plaintiff the option to elect the measure of damages as follows:

> (1)  If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> (a)  the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred . . . .
>
> [Emphasis added.]

Although the Restatement does not explicitly define "appropriate case," comment b to subsection 1(a) of section 929 of the Restatement (emphasis added) explains:

> Restoration[:]  Even in the absence of value arising from personal use, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery.  Thus if a ditch is wrongfully dug upon the land of another, the other normally is entitled to damages measured by the expense of filling the ditch, if he wishes it filled. If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a

reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. This would be true, for example, if in trying the effect of explosives, a person were to create large pits upon the comparatively worthless land of another.

On the other hand, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building. So, when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has not been decreased by the defendant's invasion.

In selecting between these two measures of quantifying property damages, our courts have recognized that "it can be unfair to use the restoration-cost method when 'the cost of repairs vastly exceeds . . . the probable market value of the property.'" Mosteller, 416 N.J. Super. at 638 (alteration in original) (quoting Correa v. Maggiore, 196 N.J. Super. 273, 285 (App. Div. 1984)); see also Model Jury Charge (Civil), 8.40, "Trespass to Real Property" (2018) ("The measure of damages to be awarded to a plaintiff entitled to a verdict is the difference between the fair market value of his/her property before and after the trespass by the defendant.").

For example, in Correa, 196 N.J. Super. at 277, the plaintiffs, who purchased a home from the defendant for $25,000, brought an action to recover damages allegedly caused by defendant's deliberate concealment of latent defects. The jury awarded the plaintiffs $33,000 in compensatory damages, reflecting the cost to raise and straighten the house. Id. at 279-80. We reversed the damage award, finding that "the cost of repairs approach should not be employed where . . . it would result in 'unreasonable economic waste.'" Id. at 285 (quoting 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 255 (1961)). We reasoned as follows:

> By virtue of the age of the building and its present condition, the cost of reconstruction is not an appropriate measure of plaintiff's loss. This is so because the cost of repairs vastly exceeds the contract price and the probable market value of the property. It would be anomalous to compel defendant to provide plaintiff with what essentially amounts to a totally refurbished home, which would be a result far exceeding what is necessary to make plaintiff whole. Rather, the diminution in value caused by defendant's deceit better reflects plaintiff's actual loss and satisfies the reasonable expectations of the parties.
>
> [Id. at 285-86.]

Nonetheless, our courts have recognized that in some circumstances, "reasonable repair costs that exceed the diminution of the property's value are appropriate . . . [such as] 'where the

property owner wishes to use the property rather than sell it.'" Mosteller, 416 N.J. Super. at 638 (quoting Velop, 301 N.J. Super. at 64). As plaintiffs argue, restoration costs may be appropriate in instances where the land is used as a residence, Berg v. Reaction Motors Division, 37 N.J. 396, 412 (1962), or where the property had a peculiar value to the owner. Huber v. Serpico, 71 N.J. Super. 329, 345 (App. Div. 1962).

However, contrary to plaintiffs' argument, restoration costs are not a mandatory measure of damages in "homestead" cases. See 525 Main St. Corp., 34 N.J. at 255 (appropriate measure of damage "rests in good sense rather than in a mechanical application of a single formula"); Mosteller, 416 N.J. Super. at 640 (restoration cost "approach should not be applied mechanically"). "[T]he 'cardinal principles are flexibility of approach and full compensation to the owner, within the overall limitation of reasonableness.'" Mosteller, 416 N.J. Super. at 640 (quoting Huber, 71 N.J. Super. at 346).

Here, although plaintiffs had a "reason personal" for seeking to restore the property, as the trial judge properly found, completion of the repairs would result in "unreasonable economic waste." 525 Main St. Corp., 34 N.J. at 255; Mosteller, 416 N.J. Super. at 642; St. Louis, LLC, 386 N.J. Super. at 188; Velop, 301 N.J. Super. at 64-66; Correa, 196 N.J. Super. at 285. As the

trial judge aptly recognized, plaintiffs' restoration costs of $750,000 to regrade the property and raise the house, would exceed what is necessary to make plaintiffs whole. See Correa, 196 N.J. Super. at 285-86. Indeed, restoration would completely change the condition of the property. Additionally, the cost of restoration greatly exceeds the $25,000 diminution in the market value of the property especially where, as here, there was evidence in the record that plaintiffs could completely waterproof their basement for $28,000.

Moreover, the property flooded years before plaintiffs purchased it in 2005, and both BOA and M.G.C.C. attempted to remediate the issue. As the judge properly found, the present action is distinguishable from Berg, where the Court found the plaintiffs were entitled to restoration of their home to the "condition immediately prior to the defendant's activities." Berg, 37 N.J. at 412. Thus, awarding plaintiffs full restoration costs of $750,000 would be unreasonable and would not represent their actual loss. Accordingly, diminution in value was the appropriate measure of damages because it was "more likely to afford full and reasonable compensation." Mosteller, 416 N.J. Super. at 638.

Although the trial court properly determined the measure of trespass damages, we part company with its determination of the amount of those damages as a matter of law. In reaching a $25,000 damage amount, the judge cited the unrefuted testimony of Imran. The judge reasoned:

> [A]ssessing the value of the property is beyond the ken of the jury. It's beyond the ken of a normal person. That requires training. That requires experience in real estate. Experience in real estate around areas that have flood issues like Monmouth County . . . and the only evidence before them on that is Mr. Imran.
>
> [Plaintiffs' counsel] challenged him, . . . . But there's no countervailing assessment. Right? So, I think to say, gosh, he should have taken into consideration other factors, you may be right about that. But then to say that it's up to the jury to determine how much more they should give, that's the part I'm concerned about. Because I think then you're asking them to engage in an analysis that only an expert is qualified to do.
>
> . . . .
>
> There was no expert to say . . . his estimate is way off. The . . . diminution of value of the property is substantially more than $25,000. There's no other testimony to that effect on diminution of value. There just isn't.
>
> And I think that it's a matter of expert opinion. It's a matter for an expert. I think speculating on how water damage impacts

31

> the value of the house, is beyond the ken of an average juror. And . . . there's no countervailing expert . . . .

Plaintiffs contend damages should have been determined instead by the jury, citing the court's recognition that "ultimately once the [expert] testimony is presented, it's for the jury to weigh that credibility." Among other things, plaintiffs also claim Imran was not aware of "the true condition of [their] backyard and basement." In particular, Imran confirmed "that no one gave [him] any information that there was an elevated groundwater table beneath this house." Because a jury may accept or reject expert testimony, we agree with plaintiffs that the amount of trespass damages should have been determined by the jury, as the factfinder, here.

"Expert testimony is generally required to determine the fair market value of real property . . . ." Pansini Custom Design Assocs., LLC v. City of Ocean City, 407 N.J. Super. 137, 143 (App. Div. 2009); see also Smart SMR v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 336 (1998) (proof of adverse effect by construction of a telecommunications tower on adjacent properties will generally require qualified expert testimony); Jacobitti v. Jacobitti, 263 N.J. Super. 608, 613 (App. Div. 1993) (cautioning "trial judges against fixing market value of real property without the benefit of expert appraisal evidence"). "Nevertheless, expert

testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001). Significantly, "a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431; Model Jury Charge (Civil), 1.13, "Expert Testimony" (2018) (instructing that jurors "are not bound by the testimony of an expert[;] . . . may give it whatever weight [they] deem is appropriate[;] [and] may accept or reject all or part of an expert's opinion(s)").

Here, as the trial court observed, BOA's real estate appraiser testified, without objection or refutation by a competing expert, that the diminution in value of the property was approximately $25,000. However, the jury was free to "accept or reject" Imran's expert testimony. That liberty is especially applicable here where Imran admitted he was unaware of the extent of flooding on the property. Because Imran did not consider the property's entire flooding history in calculating the appraised value, the jury might not have perceived his testimony as unrefuted, and could have accepted or rejected his $25,000 opinion of the diminution in value of plaintiffs' property. As such, trespass damages should have been determined by the jury. However, there is no reason to set aside the jury's award for nuisance damages to the basement.

We, therefore, find the trial judge erred in removing from the jury's consideration the amount of damages on plaintiffs' trespass claim. Accordingly, we vacate the portion of the December 21, 2015 judgment awarding plaintiffs $25,000, and remand for a new trial on damages, only, as to plaintiffs' trespass claim. However, as discussed, <u>infra</u>, the thirty-five percent "avoidable consequences" offset, determined by the first jury, shall be applied to reduce any new jury award for trespass damages.

In addressing the matters on remand, the trial court should conduct a case management conference within thirty days to set a schedule for revised or additional expert reports, limited to diminution in current market value, and to fix a new trial date. To avoid repetition and undue expense, the parties are encouraged to confer and reach stipulations, where applicable.

## III.

Plaintiffs' argument that the trial court erred in denying their application to file a third amended complaint, more than one year after the jury verdict, lacks sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(1)(E). Further, we find equally unavailing plaintiffs' contention that they were not comparatively negligent. Because we are remanding for the jury to assess damages on plaintiffs' trespass claim, we add the following brief comments.

Pursuant to the Comparative Negligence Act, a plaintiff's

negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought or was not greater than the combined negligence of the persons against whom recovery is sought.

[N.J.S.A. 2A:15-5.1.]

As such, "when the plaintiff's negligence exceeds each defendant's negligence . . . the plaintiff's cause of action cannot be sustained." Vega by Muniz v. Piedilato, 154 N.J. 496, 528 (1998).

In this action, the jury determined "[p]laintiffs' damages could have been avoided or alleviated by [p]laintiffs' exercise of reasonable care to address the water intrusion." The jury then assessed plaintiffs' percentage of damages for that failure. Because plaintiffs offered proofs "that BOA committed intentional torts," they maintain "there is no way that apportionment as to fault can be made against [them]." Plaintiffs' argument is misplaced. Restatement § 821D cmt. d. (recognizing that under trespass and private nuisance theories "liability may arise from an intentional or an unintentional invasion").

Further, "The doctrine of 'avoidable consequences,' otherwise known as the duty to mitigate damages, is based on the premise that 'a plaintiff may not recover damages for injuries which he may have avoided.'" Russo Farms v. Vineland Bd. of Educ., 144

N.J. 84, 108 (1996) (quoting <u>Barry v. Coca Cola Co.</u>, 99 N.J. Super. 270, 275 (Law Div.1967)). "As opposed to contributory negligence, the doctrine of avoidable consequences 'normally comes into action when the injured party's carelessness occurs <u>after</u> the defendant's legal wrong has been committed.'" <u>Id.</u> at 108-09 (quoting <u>Ostrowski v. Azzara</u>, 111 N.J. 429, 438 (1988)); <u>see also</u> Dan B. Dobbs, <u>Remedies</u>, §§ 3.7 at 186 (1973).

Here, plaintiffs admitted they had not taken measures to remediate the water damage. For example, they did not regrade, as recommended by their home inspector, attempt to waterproof the basement, nor hire an exterminator to determine the snakes' origin. We see no reason, therefore, to disturb the trial court's determination that principles of mitigation of damages applied to the entire verdict.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2128-15T4